**AIRBORNE HEALTH, INC. and Weil, Gotshal & Manges LLP, Plaintiffs,**

v.

**SQUID SOAP, LP, Defendant.**

**C.A. No. 4410–VCL.**

Court of Chancery of Delaware.

Submitted: Nov. 13, 2009.
Decided: Nov. 23, 2009.

Joseph J. Bellew, Esquire, Cozen O'Connor, Wilmington, DE, for Plaintiff/Counterclaim Defendant Airborne Health, Inc.

William J. Wade, Esquire, Jeffrey L. Moyer, Esquire, David Schmerfeld, Esquire, Sarah R. Stafford, Esquire, Richards, Layton & Finger, P.A., Wilmington, DE, for Plaintiff/Counterclaim Defendant Weil, Gotshal & Manges LLP.

James S. Green, Sr., Esquire, Jared T. Green, Esquire, Seitz, Van Ogtrop & Green, P.A., Wilmington, DE; Brian Smith, Esquire, J. Craig Falls, Esquire, Falls Smith LLP, Austin, TX, for Defendant Squid Soap, L.P.

## OPINION

LASTER, Vice Chancellor.

Plaintiffs Airborne Health, Inc. ("Airborne") and Weil, Gotshal & Manges LLP ("Weil") have moved for judgment on the pleadings against defendant Squid Soap, LP ("Squid Soap"). Except for two minor issues, I grant the motion. The two issues that remain are Airborne's request for a decree of specific performance, which I see no need to resolve at this stage of the proceedings, and any claim for damages based on Squid Soap's breach of the exclusive forum selection clause, which the parties have not addressed.

## I. FACTUAL BACKGROUND

I assume the following facts to be true for purposes of the motion for judgment on the pleadings. The facts are drawn solely from the pleadings, which consist of Airborne and Weil's complaint, Squid Soap's first amended answer and counterclaims, and Airborne and Weil's replies to the counterclaims. I also have considered the Asset Purchase Agreement (the "Agreement" or the "APA"), which is incorporated by reference in all of the pleadings. Because this is a motion for judgment on the pleadings, I have assumed that all disputed factual allegations would be resolved in favor of Squid Soap, the non-movant. I likewise have given Squid Soap the benefit of all reasonable factual inferences.

### A. The Parties.

Defendant Squid Soap is a Texas limited partnership with its principal place of business in Austin, Texas.

Plaintiff Airborne is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. Effective as of June 15, 2007, Airborne and Squid Soap entered into an Asset Purchase Agreement by which Airborne acquired all of Squid Soap's assets, including certain intellectual property.

Plaintiff Weil is a New York limited liability partnership with its headquarters in New York, New York. Weil served as legal counsel to Airborne for purposes of drafting and negotiating the APA.

### B. Squid Soap's Potential.

In the early 1990s, John Lynn saw a business opportunity in society's growing awareness that thorough hand washing limits the spread of germs. According to the counterclaims, the Center for Disease Control, the United States Food and Drug Administration, and the National Institute of Allergy and Infectious Diseases all launched nationwide programs to promote good hand-washing habits. I am told that the consensus view among reputable

health authorities calls for at least a twenty second wash.

In addition to the general hand-washing trend, Mr. Lynn perceived a lack of specialized hand-washing products for children. To fill the void, he developed a soap dispenser that leaves a small spot of ink on a child's hand that only can be removed after twenty seconds of hand washing. He named the product "Squid Soap." Mr. Lynn obtained three patents for the background technology and another patent for the specialized soap dispenser (together, the "Patents").

Mr. Lynn believed that germ-focused parents, educators, and health professionals would embrace his invention. According to the counterclaims, he was right. Squid Soap received national attention. It was featured in magazines such as Redbook, Woman's Day, InStyle, and Parenting, and it appeared on television shows such as Good Morning America and the Fox Morning Show. Newspapers and websites praised it.

Buoyed by its unique attributes and the same favorable market trends that propelled sales of hand sanitizer and antibacterial wipes, Squid Soap became a hit. Retailers like Wal–Mart, Target, CVS, and Walgreen's stocked Squid Soap products. A consumer product paradise beckoned with high recurrent sales and patent-protected margins. All Squid Soap needed was a nationwide marketing platform and brand-name recognition.

## C. Squid Soap Talks With Potential Strategic Partners.

In early 2007, Mr. Lynn was approached by companies and investment groups seeking to capitalize on Squid Soap's potential. Each group expressed great interest in Squid Soap. The suitors included the consumer products powerhouse Procter & Gamble, a multibillion dollar hedge fund HBK Investments, and a publicly traded business development company Capital Southwest Corporation.

Squid Soap's discussions with Capital Southwest progressed to the point that Capital Southwest suggested a candidate to run Squid Soap, Joseph Rainone. Capital Southwest also suggested that Elise Donahue, then-CEO of Airborne, could add value as a Squid Soap director. Mr. Lynn contacted Ms. Donahue, who immediately perceived Squid Soap's potential.

Led by Ms. Donahue, Airborne aggressively pursued Squid Soap for itself, going so far as to hire Mr. Rainone away from Capital Southwest. Airborne worked hard to convince Mr. Lynn that Airborne was the ideal partner for Squid Soap. Ms. Donahue repeatedly touted what she described as Airborne's marketing prowess, positive brand-name recognition, and the resulting opportunities for joint marketing of Squid Soap under Airborne's brand.

## D. Airborne's Story.

Like Squid Soap, Airborne started out as a small, single-product company focused on stopping the spread of germs. Airborne's initial product was a cocktail of various vitamins, herbs and other ingredients that Airborne marketed as preventing and even curing the common cold. Indeed, Airborne required vendors to place its product displays on their cough and cold remedy aisles.

Victoria Knight–McDowell founded Airborne in 1997. In 2005, Summit Partners acquired majority ownership of Airborne. Ms. Donahue became CEO, replacing Mrs. Knight–McDowell, who continued her role as a brand spokesperson and board member.

By 2006, propelled by celebrity endorsements and aggressive advertising, Airborne ranked at the top of a list of the

fastest-growing privately held companies. It experienced furious growth and at one time projected $300 million in annual sales. Airborne was at the pinnacle of brand recognition. Its name was its product.

### E. Squid Soap Sells To Airborne.

Airborne's story charmed Mr. Lynn. The counterclaims allege that "[b]ased on Airborne's representations about, among other things, its brand name, sterling reputation, marketing prowess, and in particular its promises to leverage the Airborne name and marketing platform to fully maximize Squid Soap's potential, Squid Soap, relying on and induced by Airborne's representations and promises, re-focused its acquisition talks to Airborne, to the exclusion of its other suitors."

Squid Soap and Airborne eventually agreed on a transaction through which Airborne would purchase Squid Soap's assets (the "Asset Purchase"). The terms of the Asset Purchase are memorialized in the APA. The APA was an integrated contract, and in Section 10.3, the parties agreed that it reflected their compete agreement on the terms for the transaction.

Several aspects of the APA stand out. Most notably, Squid Soap agreed to sell its assets for $1 million in cash at closing, plus the potential for earn-out payments of up to $26.5 million if certain targets were achieved. Squid Soap asserts in the counterclaims that "[t]he high price tag was a reflection of Squid Soap's enormous market value." What an earn-out (and particularly a large one) typically reflects is disagreement over the value of the business that is bridged when the seller trades the certainty of less cash at closing for the prospect of more cash over time. In theory, the earn-out solves the disagreement over value by requiring the buyer to pay more only if the business proves that it is worth more. But since value is frequently

debatable and the causes of underperformance equally so, an earn-out often converts today's disagreement over price into tomorrow's litigation over the outcome. Based on an earn-out of this magnitude (viewed in terms of the portion of total potential consideration), the plain inference is that Squid Soap believed that its business had tremendous value and was willing to bet heavily on that proposition.

Reinforcing this inference is a second notable feature of the APA. Airborne purchased Squid Soap's brand name, goodwill, and intellectual property, including the Patents, but the APA required that Airborne return the assets to Squid Soap if certain business targets were not met. Section 3.2 of the APA states:

> Notwithstanding anything herein to the contrary, in the event that (i) Purchaser does not incur at least $1,000,000 of marketing, account retail programs and/or advertising spending (including brand spending but excluding co-op fees, slotting fees and product discounts) specifically focused upon the [Squid Soap] Products within the first twelve months after Closing ..., and (ii) Net Sales of the [Squid Soap] Products have not reached $5,000,000 within the first twelve months after Closing, then Purchaser shall transfer the Purchased Assets existing as of such date (other than inventory) back to Seller for the consideration of $10.00 and other valuable consideration of which the Purchaser and Seller both agree is valuable and adequate consideration. Upon such transfer, each person's obligations under this Agreement shall terminate except for obligations due and payable up through the date of termination.

Similarly, Section 3.2(g) provides:

> Notwithstanding anything herein to the contrary, in the event Purchaser ceases to market, advertise and sell [Squid

Soap] Product(s) at any time prior to reaching aggregate Net Sales of $7,500,000 then Purchaser agrees to transfer the Purchased Assets existing as of such date (other than inventory) back to Seller for $10.00 and other valuable consideration of which the Purchaser and Seller both agree is valuable and adequate consideration. Upon such transfer, each person's obligations under this Agreement shall terminate except for obligations due and payable up through the date of termination.

I will refer to these provisions as the "Asset Return Provisions."

The Asset Return Provisions establish a framework in which Airborne gets to take its shot at making Squid Soap a success, but if things do not work out, then Airborne has to return the assets. Section 3.2 is particularly instructive in this regard. It gives Airborne twelve months. After that point, if Airborne has not spent $1 million on marketing and achieved $5 million in Net Sales, then Airborne must return the assets to Squid Soap. Like the earn-out, this structure indicates that Squid Soap believed its product was a winner, that it was in demand, and that if Airborne could not make a go of it, then Squid Soap would get the assets back and could pursue a relationship with someone else.

A third noteworthy aspect of the APA is the absence of any specific commitments by Airborne regarding the level of efforts or resources that it would devote. Squid Soap alleges that "the APA required Airborne to spend a minimum of $1,000,000.00 on marketing specifically for Squid Soap's products within the first 12 months after the APA was signed." This is not what the APA provides. The $1 million figure appears in Section 3.2, one of the Asset Return Provisions, and establishes a requirement that Airborne must hit if it wants to retain the assets.

A mandatory commitment by Airborne to expend funds easily could have been drafted. All it needed to say was "Purchaser shall incur at least $1,000,000 of marketing, account retail programs and/or advertising spending (including brand spending but excluding co-op fees, slotting fees and product discounts) specifically focused upon the Squid Soap Products within the first twelve months after Closing." Squid Soap did not obtain a commitment of this nature.

A fourth noteworthy feature of the APA is the absence of detailed representations by Airborne regarding the issues that Squid Soap now claims were critically important. Squid Soap alleges:

> In entering the APA, Squid Soap relied on and was induced by Airborne's promises and representations regarding its positive brand name and image, its marketing power, as well as Airborne's intent and, importantly, its ability to market Squid Soap and to leverage Airborne's positive brand image. These representations by Airborne were at the core of Squid Soap's decision to sell to Airborne. Given their importance, Squid Soap relied upon Airborne's repeated assurances about its reputation and brand image and their effect on Airborne's ability to market and leverage that positive brand name.

Yet there are no contractual representations in the APA by Airborne regarding these matters.

The APA called for a simultaneous signing and closing, which took place on June 15, 2007.

## F. Airborne Suffers Significant Reverses.

According to the counterclaims, at the time Squid Soap entered into the APA,

Squid Soap did not know that Airborne's product had been severely criticized by a special investigation conducted by ABC News and aired on Good Morning America. The special report found that the clinical study on which Airborne based its germ-fighting claims had been produced by a "two-man operation started up just to do the Airborne study." The news report led to intense scrutiny of Airborne's products, marketing, and claims.

Squid Soap also says it did not know then that there was a class action pending against Airborne in California state court, filed in May 2006, which asserted various claims for false or misleading advertising, consumer fraud, deceptive or unfair business practices, concealment, omission, and unfair competition (the "California Action"). The Center for Science in the Public Interest, a non-profit organization with significant expertise in litigation over product mislabeling, joined the California Action on the plaintiffs' side. The Center's litigation director called the case a "great opportunity for CSPI to participate in a major lawsuit against one of the biggest supplement frauds in the country."

In March 2008, nine months after signing the APA with Squid Soap, Airborne settled the California Action for $23.5 million. Airborne also agreed to place ads offering rebates in ubiquitous magazines such as Better Homes & Gardens, Parade, People, and Newsweek.

The settlement spawned a maelstrom of media attacks on Airborne. Newspaper articles, television reports, and internet postings bashed Airborne for its bogus advertising debacle. The counterclaims quote from a series of reports and single out comments like "Airborne is essentially an overpriced, run-of the-mill vitamin pill that's been cleverly, but deceptively, marketed." Another states that "now everyone is aware that Airborne is marketed through deception." In another example: "The company's claims had no competent, scientific support.... And even worse, the company failed to adequately warn vulnerable consumers, such as pregnant women, of potential health risks."

I am told that Airborne handled the media storm poorly. Ms. Donahue is said to have discounted the problem by questioning consumers' intelligence, saying, "Consumers are not scientifically minded enough to understand a clinical study."

Government regulators got in on the act. The Federal Trade Commission ("FTC") and the Attorneys General for thirty-two states sued Airborne and its founders for the false marketing. Airborne eventually agreed to a $30 million settlement with the FTC and a $7 million settlement with the Attorneys General, escrowed another $6.5 million for additional consumer claims, and committed to completely revamp its marketing program. As part of the FTC settlement, Airborne agreed to send a "Government Ordered Disclosure" to all of its distributors, resellers and retailers which recited that the FTC had charged Airborne with "making deceptive claims for Airborne Effervescent Health Formula and other Airborne branded products" and that "[a]ccording to the FTC, [Airborne] lacked scientific evidence that [its] products prevent colds, protect against germs, ... or protect against colds...."

Squid Soap contends that at the time of the Asset Purchase, Airborne not only knew about the California Action but also knew that the regulators were on its trail. Squid Soap alleges that on March 8, 2005, the FTC issued a "matter initiation notice" and on February 22, 2007, issued a "civil investigation demand" regarding its investigation of possible violations by Airborne (together, the "FTC Notices"). Squid Soap takes particular umbrage at the fact that Weil was representing Airborne in the

California Action at the same time it was negotiating the APA for Airborne. On June 25, 2007, just ten days after the Asset Purchase closed, Weil removed the California Action to federal court. Squid Soap points out that Airborne and Weil must have known about the California Action. Clearly, they did.

Airborne's post-APA problems immediately became Squid Soap's problems because Airborne owned Squid Soap and because Squid Soap had been repackaged as "Squid Soap by Airborne." Squid Soap alleges that Airborne's difficulties "killed Squid Soap in its infancy."

## G. Airborne Returns The Squid Soap Assets.

Since its legal stumbles, Airborne has engaged in damage control. Mrs. Knight–McDowell reacquired Airborne and launched a highly publicized campaign to restore consumer confidence and rebuild the company. According to the counterclaims, Airborne has focused on its historic products and has done nothing to market or rehabilitate Squid Soap.

Under the Asset Return Provisions, Airborne was required to return Squid Soap's assets, including the Patents, to Airborne if the financial thresholds in those provisions were not met. It is undisputed that the thresholds were not met.

Squid Soap contends that because the thresholds were not met, the assets automatically reverted to Squid Soap on June 15, 2008, one year after the closing of the Asset Purchase. This is not what the Asset Return Provisions say. They obligate Airborne to return the assets, but title does not revert automatically.

Airborne attempted to return the assets to Squid Soap. In an email dated September 9, 2008, Mr. Rainone, President of Airborne's Squid Soap Division, advised

Squid Soap that Airborne would be returning the assets. As quoted in the counterclaims, the email stated:

> We [Airborne] understand your need to transition [the Patents and other purchased assets back to Squid Soap] and will do whatever is necessary to make it a smooth one.... Our goal is to transition this to you in a way which will make it seamless for our customers.... [L]et's discuss a plan for a smooth transition.

It appears that at the same time, Airborne was in the process of securing financing from BNP Paribas, secured by Airborne assets that included the Patents. On September 29, 2008, just three weeks after Mr. Rainone's email, Airborne entered into an agreement assigning an interest in the Patents to BNP Paribas. The interest was recorded the following day with the United States Patent and Trademark Office.

Squid Soap sees further perfidy in Airborne's actions, which it claims "prevent[ed] Squid Soap from marketing or selling Squid Soap to any would-be buyers after the reversion date [allegedly June 15, 2008] but before the onset of the current economic crisis that has solidly dead-stopped private investment into companies like Squid Soap." I take judicial notice of the indisputably troubled state of the financial markets prior to June 2008, including the shotgun acquisition of Bear Stearns by JPMorgan in March of that year. Squid Soap has not identified any potential buyer, interested party, or prospect that it could have pursued.

It is undisputed that Airborne continued to attempt to return the assets to Squid Soap. It is equally undisputed that Squid Soap has refused to accept them.

## H. Squid Soap Sues In Texas, But That Action Is Dismissed.

The APA contains a forum selection clause requiring all disputes arising out of or relating to the Agreement to be heard in this Court or any federal court in the State of Delaware. Section 10.4(b) states:

All actions and proceedings arising out of or relating to this Agreement shall be heard and determined in the Chancery Court of the State of Delaware or any federal court sitting in the State of Delaware, and the parties hereto hereby irrevocably submit to the exclusive jurisdiction of such courts (and, in the case of appeals, appropriate appellate courts therefrom) in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding.

Despite this provision, on December 3, 2008, Squid Soap filed suit in the United States District Court for the District of Texas against Airborne and BNP Paribas asserting various causes of action arising out of and relating to the APA, including conversion, fraud, negligent misrepresentation, breach of fiduciary duty, unjust enrichment, and conspiracy. On February 6, 2009, Squid Soap amended its complaint in the Texas action to drop BNP Paribas and add Weil. On May 14, 2009, the Texas court dismissed the Texas action without prejudice.

Meanwhile, on March 6, 2009, Airborne and Weil sought a declaratory judgment from this Court establishing that they were not liable under the APA. On June 30, Squid Soap amended it answer to assert counterclaims against Airborne and Weil. After Airborne and Weil replied to the counterclaims, they moved for judgment on the pleadings.

## II. ANALYSIS

A motion for judgment on the pleadings pursuant to Court of Chancery Rule 12(c) may be granted where there are no material issues of fact and the movant is entitled to judgment as a matter of law. *See Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 & n. 7 (Del.1993). I will analyze the motion for judgment on the pleadings by evaluating the causes of action that Squid Soap has asserted in its counterclaims. The core declaratory judgment that Airborne and Weil seek is effectively a request for a determination that Squid Soap cannot assert a claim against them, and thus it makes sense to examine Squid Soap's claims. I will then address any remaining aspects of the relief that Airborne and Weil request.

### A. Squid Soap's Claim for Fraud and Fraudulent Inducement.

Squid Soap's first cause of action asserts that Airborne fraudulently induced Squid Soap to enter into the APA by representing false statements as true, actively concealing facts, and/or failing to disclose material facts. Squid Soap bases this claim both on a contractual representation in the APA and on misrepresentations outside of the APA.

### 1. The Fraud Claim Based On Airborne's Litigation Representation.

Squid Soap contends that Airborne committed fraud by making a contractual misrepresentation in the APA as to the absence of litigation. According to Squid Soap, "Airborne intentionally concealed and failed to disclose to Squid Soap the existence of the [California] Action, the FTC investigation, or other pending litigation or investigations. . . ." Because of Delaware's strong public policy against intentional fraud, a knowingly false contrac-

tual representation can form the basis for a fraud claim, regardless of the degree to which the agreement purports to disclaim or eliminate tort remedies. *See Abry Partners V, L.P. v. F & W Acquisition LLC,* 891 A.2d 1032, 1061–64 (Del.Ch. 2006).

■ Determining whether Airborne's contractual representation was false requires me to focus on the specific language of that representation. In the APA, both Squid Soap and Airborne made contractual representations. Squid Soap's representations appear in Article V. Airborne's representations appear in Article VI. Squid Soap made 18 separately numbered representations to Airborne, spanning 8 pages of the APA. Airborne made only 4 separately numbered representations to Squid Soap, spanning only 2 pages.

As with the representations as a whole, the parties' representations regarding litigation differ significantly. In Section 5.12 of the APA, Squid Soap represented to Airborne that:

Except as set forth in Schedule 5.12, there is no Legal Proceeding pending or, to the Knowledge of Seller, threatened against Seller (or to the Knowledge of Seller, pending or threatened, against any of the officers, directors or key Employees of Seller with respect to their business activities on behalf of Seller), or to which Seller is otherwise a party, before any Governmental Body; nor to the Knowledge of Seller is there any reasonable basis for any such Legal Proceeding.

Section 1.1 of the Agreement defines "Legal Proceedings" as "any judicial, administrative or arbitral actions, suits, mediations, investigations, inquiries, proceedings or claims (including counterclaims) by or before a Governmental Body."

The plain language of Section 5.12 addresses the existence of any "Legal Pro-

ceedings" of any kind. For this representation to be true, Squid Soap had to disclose on Schedule 5.12 any legal proceeding to which it was a party, or which it knew was threatened against it, or which it knew was pending or threatened against its officers, directors, or key employees and related to their business activities for Squid Soap. The representation is an example of the "informational" approach in which, "[i]n effect, the Company warrants that it has delivered a list of *all* litigation to the Buyer, but makes no representation as to how any of the disclosed lawsuits will come out, or the effect on the Company of losing one or more of them." 2 Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 11.04[10] at 11–60 (2001) (emphasis added).

In Section 6.3 of the APA, Airborne made a markedly different representation about the existence of pending litigation. Section 6.3 of the APA states only that "[t]here are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened that are reasonably likely to prohibit or restrain the ability of Purchaser to enter into this Agreement or consummate the transactions contemplated hereby." Unlike Squid Soap's representation, Airborne's representation does not address the existence of any "Legal Proceedings" of any kind. It addresses only "Legal Proceedings" that are "reasonably likely to prohibit or restrain the ability of Purchaser to enter into this Agreement or consummate the transactions contemplated hereby."

If Airborne had made the broader representation that Squid Soap provided, I would have no difficulty concluding that the language required disclosure of the California Action and the FTC Notices.

But that is not the representation that Squid Soap obtained.

The plain language of Airborne's representation obligated Airborne to disclose any "Legal Proceedings" that were (1) "reasonably likely to prohibit or restrain the ability of [Airborne] to enter into this Agreement" *or* (2) "reasonably likely to prohibit or restrain the ability of [Airborne] to ... consummate the transactions contemplated hereby." This was not a general representation regarding the existence of litigation. It addressed whether there was any litigation affecting Airborne's ability to sign the APA and close the deal. As hypothetical examples—assuming these examples met the contractually bargained-for standard—the following threatened actions would have required disclosure by Airborne: a lawsuit by a lender asserting that Airborne could not enter into the APA because the cost of the deal would cause Airborne to violate its covenants; or a claim by a preferred stockholder asserting that Airborne could not close without its consent; or a challenge by a holder of a non-compete who contended that the acquisition would cause Airborne to enter into the prohibited business; or a suit to block the deal on antitrust grounds.

It is undisputed that no litigation was threatened or pending as of June 15, 2007—the date of the simultaneous signing and closing—that was "reasonably likely to prohibit or restrain" Airborne's ability to sign and close. No one attempted to interfere with the signing or closing, which appears to have gone off without a hitch. The California Action did not seek to interfere with the signing or closing. That action sought damages on behalf of the class members relating to Airborne's core product. The case had nothing to do with the APA or Squid Soap. The FTC Notices likewise addressed Airborne's core product and had nothing to do with the APA or Squid Soap.

Squid Soap argues, and I have considered, whether the phrase "consummate the transactions contemplated hereby" means more than just the closing of the APA and extends to post-closing obligations such as earn-out payments. Squid Soap points out that "transactions" appears in the plural, and it argues that this usage must mean something more than just closing. For Squid Soap, the something more must be the earn-out payments. Squid Soap asserts that the California Action and the FTC Notices were "Litigation Proceedings" that would affect the on-going health of Airborne's business, which would affect Airborne's ability to make Squid Soap a success, and thus would "restrain the ability of Airborne" to make the earn-out payments.

As a corporate and business practitioner prior to joining the Court, I start with the general observation that "consummate the transactions contemplated hereby" is language that refers to closing. The use of "transactions" in the plural recognizes that a series of things have to be accomplished at closing, particularly in an asset deal. That is what the phrase means. A cobbler knows an awl.

Not surprisingly, the leading deal treatise I cited above consistently uses the phrase "consummating a transaction" to refer to closing. For example, after describing the seller's principal interest in obtaining the purchase price, the authors write: "[T]he Buyer's representations are more 'transactional' in nature than those of the Seller. What the Seller finds important is centered around the Buyer's ability to *consummate the transaction.*" Kling & Nugent, *supra,* § 12.02 at 12–4 (emphasis added). Later, in describing closing conditions based on the existence of litigation, the authors explain: "There are, it should

be noted, two different types of litigation that could arise post-signing. The first is general business litigation: a claim that has nothing to do with the acquisition but relates to the Company's business. The second is litigation by a third party or governmental entity *relating to the consummation of the transaction.* Common examples include antitrust actions and going private litigation that alleges breach of fiduciary duty." *Id.* § 14.04 at 14–20 n. 1 (emphasis added).

This interpretation conforms to ordinary usage. In both *Black's Law Dictionary* and dictionaries of standard English, the verb "consummate" is defined to mean "to complete" (including when referring to a marriage). *See* Black's Law Dictionary 317 (6th ed. 1990) ("To finish by completing what was intended"); Webster's New Collegiate Dictionary 242 (1979) ("finish, complete ([as in] a business deal)"); The American Heritage College Dictionary 299 (3d ed. 1993) ("To bring to completion or fruition; conclude"). The closing is when the transactions contemplated by the APA were completed.

Reading the agreement as a whole, Section 4.1 of the APA reinforces the plain meaning of the phrase. Section 4.1 governs the scheduling of the closing date and provides that "consummation of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities . . . shall take place . . . on the date hereof (the 'Closing Date')." This language is consistent with the plain meaning of "consummation of the transactions" as referring to closing. The fact that Section 4.1 uses a 14 word phrase in place of the term "transactions" reinforces my view as to why "transactions" appears in the plural rather than the singular: it refers to the "purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities." The various ancillary obligations and transactions necessary for closing included the purchase and transfer of the Purchased Assets (Section 2.1), the assumption of liabilities by Airborne under the Purchased Contracts (Section 2.3), compliance with a list of Closing Deliveries to be made by Squid Soap (Section 4.2), execution and delivery of various Seller and Purchaser Documents (Sections 5.2 and 6.2), and the payment of the Closing Purchase Price by Airborne (Section 4.3).

In considering whether "transactions" extends to the earn-out, recall that Squid Soap did not bargain for any guarantee of post-closing payments. There was a possibility of earn-out payments if certain targets were hit, but Airborne had no express contractual obligation to meet those targets or to make any kind of payment. There were thus no post-closing earn-out "transactions" that necessarily would be "consummated." Indeed, the parties contemplated that Airborne might *not* hit the targets and would then fulfill its obligations by returning the purchased assets to Squid Soap.

Squid Soap's approach to Section 6.3, in which Airborne's limited litigation representation would extend to anything likely to restrain Airborne's ability to conduct its business and provide the earn-out payments, would convert Section 6.3 into an obligation to disclose litigation that could have a material adverse effect ("MAE") on Airborne's business. An MAE-based disclosure is a common version of a litigation disclosure provision. *See* Kling & Nugent, *supra,* § 14.04 at 14–21 (describing different formulations of litigation disclosures, some using MAE formations). Squid Soap could have bargained for it. The negotiations over such a provision would have involved numerous drafting issues, including the phrasing of the basic standard (*e.g.,* is/will/would/might/could [reasonably] [likely to] have [versus not have] a material

adverse effect), whether to extend the impact to the business and its prospects, whether to use quantifiable standards, the inclusion of carve-outs, and a host of other issues. *See generally* Kenneth A. Adams, *A Manual of Style for Contract Drafting* 149, 156–79 (2d ed. 2008) (discussing the wide range of issues raised in negotiating and drafting MAE and material adverse change provisions).

Section 6.3 does not contemplate MAE-based litigation disclosure, and I will not re-write the APA to include such a provision. To recognize that this is what Squid Soap wants is sufficient to defeat Squid Soap's interpretation of the phrase "consummate the transactions." That phrase refers to closing, not to future earn-out payments.

Viewing the pleadings in the light most favorable to Squid Soap, Airborne's representation in Section 6.3 was accurate. I therefore enter judgment on the pleadings against Squid Soap and in favor of Airborne on Squid Soap's contract-based fraud claim.

## 2. The Fraud Claim Based On Extra–Contractual Misrepresentations.

In addition to its claim based on contractual fraud, Squid Soap contends that Airborne committed fraud by making extra-contractual representations, actively concealing facts, and failing to disclose material facts. Analyzing this claim requires that I consider whether the APA bars Squid Soap's right to assert fraud claims based on extra-contractual representations.

Sophisticated parties frequently bargain for anti-reliance provisions in negotiated agreements. The purpose of an anti-reliance provision is to make clear what information the contracting party did and did not rely on when entering into the transaction. To enhance certainty in contracting and eliminate the threat of tort claims based on oral statements or an open-ended universe of information, Delaware permits parties to disclaim reliance on representations outside of the written agreement. *See Abry Partners,* 891 A.2d at 1057; *Kronenberg v. Katz,* 872 A.2d 568, 593 (Del.Ch.2004); *see generally* Steven M. Haas, *Contracting Around Fraud Under Delaware Law,* 10 Del. L.Rev. 49 (2008).

An anti-reliance provision must be explicit, and a standard integration clause is not enough. As Vice Chancellor Strine has explained,

> Because Delaware's public policy is intolerant of fraud, the intent to preclude reliance on extra-contractual statements must emerge clearly and unambiguously from the contract.... Stated summarily, for a contract to bar a fraud in the inducement claim, the contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract. The presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not suffice to bar fraud claims.

*Kronenberg,* 872 A.2d at 593.

Airborne argues that the APA contains an anti-reliance provision. Section 10.3 of the APA states:

> *Entire Agreement: Amendment and Waivers.* This Agreement (including the schedules and exhibits thereto) represents the entire agreement between

the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

This is a standard integration clause, albeit a wordy one. Nothing in this provision resembles anti-reliance language. It defines the parties' agreement. It does not disclaim reliance. *See* Haas, *supra*, at 62–68 (analyzing Delaware cases), 72–75 (providing examples of anti-reliance language), and 87–88 (summarizing requirements for enforcement and offering recommended provisions).

The APA contains another section that undercuts the idea that its plain vanilla integration clause in fact operates as an anti-reliance provision. Like many transaction agreements, Article VIII of the APA establishes indemnification procedures to address contractually defined types of "Losses," including breaches of representations and warranties. Section 8.7 of the APA addresses the extent to which the indemnification mechanism is intended to provide an exclusive remedy to the parties to the agreement. It states:

> *Exclusive Remedy.* From and after the Closing Date, the provisions of this Article VIII and the rights and limitations hereunder shall be the sole and exclusive remedy for any claims arising out of, resulting from or related to the subject matter of this Agreement or the transactions contemplated hereby except for claims involving fraud or intentional misrepresentation.

Unlike a similar exclusive remedy provision in *Abry Partners,* this provision preserves the parties' right to purse "claims involving fraud or intentional misrepresentation." *See Abry Partners,* 891 A.2d at 1042–43. It does not contain language that would limit the right to claims "involving fraud or misrepresentation based on the contractual representations in the agreement." When drafters specifically preserve the right to assert fraud claims, they must say so if they intend to limit that right to claims based on written representations in the contract. I will not imply that limitation.

██ I conclude that the APA does not contain anti-reliance language or any other provision that would limit Squid Soap's ability to assert a common law fraud claim or fraud-in-the-inducement claim. I therefore turn to a substantive analysis of this claim.

A claim for common law fraud requires "(1) a false representation of material fact; (2) made by a person with knowledge that

the representation is false, or with reckless indifference to the truth; (3) an intention to induce the person to whom it made to act or refrain from acting in reliance upon it; (4) causing that person, in justifiable reliance upon the false statement, to take or refrain from taking action; (5) causing such person to suffer damage by reason of such reliance." Donald J. Wolfe, Jr. & Michael A. Pittinger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 2.03[b][1], at 2–32 (2009).

 Court of Chancery Rule 9(b) requires that "[i]n all averments of fraud . . ., the circumstances constituting fraud . . . shall be stated with particularity." The relevant circumstances are "the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation." *Trenwick Am. Litig. Trust v. Ernst & Young LLP,* 906 A.2d 168, 207–08 (Del.Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Trust v. Billett,* 931 A.2d 438 (Del.2007). The core test is whether the claim has been pled "with detail sufficient to apprise the defendant of the basis for the claim." *Abry Partners,* 891 A.2d at 1050.

Squid Soap's allegations of extra-contractual fraud are generalized and non-specific. The counterclaims do not identify any specific fact that was misrepresented, and they do not mention any person or the time, place, or contents of the misrepresentation. The best the counterclaims offer is the type of blanket allegation quoted in the Factual Background, *supra.* A similar example appears in paragraph 110 of the counterclaims, found under the heading "II. CAUSES OF ACTION," subheading "A. Fraud and Fraudulent Inducement," which states:

Airborne made misrepresentations regarding its marketing prowess and ability, positive brand-name recognition, and the opportunities for joint marketing of Squid Soap under Airborne's brand name. Airborne intentionally misrepresented, actively concealed, and failed to disclose facts and the truth about the value of its brand image, the impending downfall of its marketing and reputation, and the certain effect on its ability to market Squid Soap's products. Airborne knew or should have known that the public allegations made against its products and marketing would not only devastate its brand name and customer loyalty—thereby sinking any products associated with Airborne—but would also drain Airborne of its resources and energy in recovering from the devastation.

Nowhere do the counterclaims provide any detail about what was actually said, who said it, where, or when. Generalized allegations of this nature are insufficient under Rule 9(b).

 Faced with this level of pleading, I asked Squid Soap's counsel during the hearing for the most specific statement he could give me as to what was said to Squid Soap that was false or materially misleading. Counsel responded with the types of generalizations set forth in the complaint and the argument that without discovery, he was not in a position to provide more. The problem for his client is that when a plaintiff claims fraud, the plaintiff should be able to say when he was lied to, or what specifically was said to him that was materially misleading by omission. The lack of prior discovery poses no impediment to a plaintiff's ability to plead "the circumstances constituting fraud." After all, the plaintiff was there. Moreover, because the implications of a fraud claim are so significant, including its power to set aside contractual relationships that otherwise would be governed by the negotiated agreements

between sophisticated parties, public policy requires a specific articulation of the statement that would have these effects.

Had counsel been able to proffer particulars about when Squid Soap or Mr. Lynn was lied to (such as Ms. So-and-So said such-and-such at a face-to-face meeting that was held in her offices in May 2007), and were the statement an actionable misrepresentation (as opposed to the sales talk that the law labels puffery), then I would have pondered whether to permit Squid Soap to replead. Without this level of detail, which a plaintiff who actually was defrauded should be able to provide, Rule 9(b) requires dismissal.

The counterclaims also assert that Airborne misrepresented that "it would transition the patents back to Squid Soap." The counterclaims themselves allege that Airborne "has now attempted to return Squid Soap's once-promising, now-destroyed products and the Patents." There is no reasonable basis for me to infer that Airborne failed to return the Patents when the counterclaims allege that Airborne in fact attempted to return the Patents. Nor can I accept Squid Soap's as-pled theory of harm, which depends on a counterfactual allegation about when the M & A markets deteriorated, combined with the speculative possibility that a sale of the Patents could have taken place, without identifying so much as a prospect that Squid Soap supposedly could have pursued.

I therefore enter judgment on the pleadings against Squid Soap and in favor of Airborne on Squid Soap's claims of extra-contractual fraud and fraudulent inducement.

## B. Equitable Fraud and Negligent Misrepresentation.

Squid Soap contends that if it cannot recover from Airborne for common law fraud, it can nevertheless recover for equitable fraud, which it alternatively terms negligent misrepresentation. Equitable fraud is separate from, and broader, than common law fraud: "Whatever amounts to fraud, according to the legal conception, is also fraud in equitable conception; but the converse of this statement is not true. The equitable theory of fraud is much more comprehensive than that of the law, and contains elements entirely different from any which enter into the legal notion." 3 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 872 at 420 (5th ed. 2002).

The extensive and flexible remedial power of this Court to address all types of fraud dates back to the origins of equity itself, when parties appealed to the King (and later to his Chancellor) to address conduct, including fraud, that was irremediable in courts at law. *See* 1 Joseph Story, *Commentaries on Equity Jurisprudence* § 184–85, at 198–199 (Melville M. Bigelow ed., Beard Books 2000) (1835). Equitable fraud is not limited by particular elements. As Justice Story explains,

> It is not easy to give a definition of Fraud in the extensive signification in which that term is used by Courts of Equity; and it has been said that these courts have, very wisely, never laid down as a general proposition which shall constitute fraud, or any general rule beyond which they will not go upon the ground of fraud, lest other means of avoiding the equity of the courts should be found out.

*Id.* § 186, at 200. Professor Pomeroy states the proposition even more strongly:

> It is utterly impossible to formulate any single statement which shall accurately define the equitable conception of fraud, and which shall contain all of the elements which enter into that conception; these elements are so various, so differ-

ent under the different circumstances of equitable cognizance, so destitute of any common bond of unity, that they cannot be brought within any common formula. To attempt such a definition would therefore be not only useless, but actually misleading.

Pomeroy, *supra,* § 873, at 420–21.

■ The flexibility of the doctrine of equitable fraud is necessary to allow courts of equity to address fraud in all of its forms, unhampered by the formalism that traditionally limited the common law courts. "Fraud in equity includes all willful or intentional acts, omissions, and concealments which involve a breach in either legal or equitable duty, trust, or confidence, and are injurious to another, or by which an undue or unconscientious advantage over another is obtained." *Id.* § 873 at 422. "Courts of Equity do not restrict themselves by the same rigid rules as Courts of Law do in the investigation of fraud, and in the evidence and proofs required to establish it." Story, *supra,* § 190, at 202.

One of the ways in which this Court has exercised equity's traditional vigilance with respect to fraud has been to loosen the pleading and proof requirements where the facts of the case suggest an equitable reason to do so. Principal among these changes has been the view that equitable fraud does not require a showing of *scienter,* "reflecting its willingness to provide a remedy for negligent or innocent misrepresentation." Wolfe & Pittinger, *supra,* § 2.03[b][1] at 2–33. Thus, to claim equitable fraud, "the plaintiff need not show that a statement was made with knowledge that it was false or in reckless disregard of the truth." *Id.*

■ Equitable fraud is not available in every case or to every plaintiff. It requires special equities, typically the existence of some form of fiduciary relation-

ship, such as that between a director and stockholder or a trustee and *cestui que trust,* although other circumstances might be cited. *See U.S. West, Inc. v. Time Warner, Inc.,* 1996 WL 307445, at *24 (Del.Ch. June 6, 1996) (Allen, C.).

■ This case does not involve a special circumstance that would merit exercising this Court's equitable power to go beyond the traditional framework of common law fraud. The parties involved—Airborne and Squid Soap—were counterparties who negotiated at arms' length. Neither occupied a relationship of trust or confidence with respect to the other. Both were sophisticated parties advised by capable counsel—Weil for Airborne and Vinson & Elkins for Squid Soap.

Given these undisputed facts, there is no room in this case for the doctrine of equitable fraud. I therefore enter judgment against Squid Soap and in favor of Airborne on the equitable fraud claim.

## C. Breach Of Contract.

After incorporating the rest of its allegations by reference, Squid Soap contends that Airborne breached the APA "by making false representations about its marketing abilities and prowess, by failing to disclose the [California] Action and other litigation, and by failing to market and promote Squid Soap's products as promised and required by the APA." The counterclaims do not establish a claim for breach of contract.

■ The claim that Airborne breached the APA "by making false representations about its marketing abilities and prowess" has no contractual underpinning. The APA does not contain any representations about Airborne's "marketing abilities and prowess." Squid Soap has not cited any

provision of the APA that could support this claim.

The claim that Airborne breached the APA "by failing to disclose the [California] Action and other litigation" is a re-hash of the contractual fraud claim based on Section 6.3 of the APA. As discussed in Part II.A.1, *supra,* the pleadings establish that Airborne's limited representation in Section 6.3 was accurate. There is no viable claim for breach.

 The claim that Airborne breached the APA "by failing to market and promote Squid Soap's products as promised and required by the APA" depends on a misreading of the Asset Return Provisions. The plain language of those provisions requires that Airborne return the assets if certain hurdles were not met. The provisions do not obligate Airborne to expend particular sums on marketing or to take any particular actions. They do not contain any language imposing on Airborne any obligation to expend resources or to take action with respect to Squid Soap. The provisions ensure that Squid Soap gets the assets back if Airborne fails to make Squid Soap successful to the extent described in the Asset Return Provisions. I will not belabor the analysis further because the meaning of these provisions is self-evident.

 The claim that Airborne breached the APA by retaining the Squid Soap assets after June 15, 2008, incorrectly presumes that title passed automatically to Squid Soap on that date. Each of the Asset Return Provisions states that if the thresholds are not met, "then Purchaser shall transfer the Purchased Assets existing as of such date (other than inventory) back to Seller...." Each then states that "[u]pon such transfer, each person's obligations under this Agreement shall terminate except for obligations due and payable up through the date of termination."

The plain language of the Asset Return Provisions establishes that Airborne was required to transfer the assets back to Airborne and had the right by doing so to discharge all subsequent contractual obligations. The transfer did not happen automatically. The counterclaims allege that Airborne attempted to arrange for the transfer. Nothing that they allege would support a claim for breach. I also perceive no basis for damages based on Squid Soap's vague and generalized assertion that it might have been able to find a buyer had the assets been transferred earlier. Fatal to this claim is Squid Soap's failure to identify any potential buyer, interested party, or prospect that it could have pursued.

 Squid Soap also contends that Airborne somehow breached the Asset Return Provisions when "Airborne dumped or attempted to dump at least some of its remaining Squid Soap inventory to mega-discount stores, such as Big Lots." The Asset Return Provisions exclude inventory from the scope of the assets to be returned, leaving Airborne free to dispose of the inventory as it wished.

I therefore enter judgment for Airborne on the breach of contract claim.

## D. The Implied Covenant of Good Faith and Fair Dealing.

 Squid Soap ultimately falls back to the implied covenant of fair dealing. This count recasts both of Squid Soap's basic complaints-Airborne's failure to disclose litigation risks and Airborne's failure to spend on marketing or achieve sales-as breaches of the implied covenant.

 The implied covenant of good faith and fair dealing inheres in every contract governed by Delaware law and "requires a party in a contractual relationship

to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del.2005) (internal quotation omitted). The implied covenant does not apply when "the subject at issue is expressly covered by the contract." *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del.Ch.1992), *aff'd*, 609 A.2d 668 (Del.1992). At the same time, the covenant exists to fulfill the reasonable expectations of the parties, and thus the implied obligation must be consistent with the terms of the agreement as a whole. *See Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 770 (Del.Ch.2009) ("[T]he implied covenant only applies where a contract lacks specific language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract."), *aff'd*, 976 A.2d 170 (Del.2009). The doctrine thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer. In the Venn diagram of contract cases, the area of overlap is quite small.

■■■■ The test for the implied covenant depends on whether it is "clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter." *Katz v. Oak Indus., Inc.*, 508 A.2d 873, 880 (Del.Ch.1986) (Allen, C.). "[I]mplying obligations based on the covenant of good faith and fair dealing is a cautious enterprise." *Cincin-*

*nati SMSA Ltd. v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del.1998). "[C]ourts should be most chary about implying a contractual protection when the contract easily could have been drafted to expressly provide for it." *Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1035 (Del.Ch.2006).

Squid Soap's implied covenant claim based on litigation disclosure is easily addressed. The parties to the APA agreed upon a specific representation by Airborne relating to litigation in Section 6.3. Squid Soap could have insisted on a broader representation. With the benefit of hindsight, it should have. But the implied covenant is not a means to re-write agreements.

■■■■ Squid Soap's arguments regarding Airborne's obligation to spend funds on marketing and to achieve sales have a tinge more color. Squid Soap understandably questions what it obtained under the APA if Airborne had no obligation actually to expend resources. The APA does not contain any language that specifically addresses the issue, either by requiring Airborne to expend resources or by saying explicitly that Airborne has no obligation to expend resources. The APA does, however, contain explicit financial targets on which the parties agreed. This allows Squid Soap to contend plausibly that this case falls within the narrow band of the implied covenant. The provision Squid Soap seeks to imply is that Airborne could not arbitrarily refuse to expend resources and thereby deprive Squid Soap of the prospects for the earn-out. In Squid Soap's view, Airborne at least had to make an honest go of it.

■■■■ There is support in our law for this argument. When a contract confers discretion on one party, the implied covenant requires that the discretion be used

reasonably and in good faith.[1] Airborne thus could not have refused arbitrarily or in bad faith to pursue the Squid Soap business. But Squid Soap does not contend that Airborne failed to expend funds to make the business a success arbitrarily, in bad faith, or for no reason. Squid Soap's counterclaims quite clearly allege that Airborne suffered a corporate crisis in its core business and, at least in part as a result of that crisis, did not expend resources on Squid Soap. Squid Soap specifically recognizes that Airborne was "[u]ndoubtedly restrained by the legal and financial burdens of the settlement and systemic market damage." This as-pled scenario does not support a claim that Squid Soap exercised its contractual discretion in bad faith.

Squid Soap's position is also undercut by the ease with which Squid Soap could have insisted on specific contractual commitments from Airborne regarding the expenditure of resources, or some form of "efforts" obligation for Airborne. These provisions are familiar to any transactional lawyer, and Squid Soap was a sophisticated party represented by able counsel. Moreover, Section 7.6, entitled "Obligations of Seller," provides that "[e]ach Selling Partner agrees to take all reasonable actions necessary to cause Seller to perform its obligations hereunder and to otherwise comply with the terms of this Agreement." Squid Soap could have insisted on a provision binding Airborne. Rather than holding out for these types of contractual protections, Squid Soap accepted earn-out provisions that are expressly phrased in conditional terms.

Importantly for purposes of the implied covenant, I do not think it irrational, or even unreasonable, that Squid Soap would have chosen this deal structure. The APA provides contractual downside protection, but in the different form of a requirement that Airborne return the assets so that Squid Soap could go elsewhere. Squid Soap alleges that it had a hot property, and thus the prospect of getting the assets back and linking up with a better partner could well have made sense. At the same time, Airborne had powerful incentives to want Squid Soap to succeed, and thus Squid Soap and Airborne's interests were largely aligned. Squid Soap made an understandable business decision, albeit one it now regrets.

This is not a case in which Squid Soap has been deprived of the fruit of its bargain arbitrarily or in a manner where the implied covenant of good faith and fair dealing should come into play. The price

---

1. *Amirsaleh v. Bd. of Trade,* 2008 WL 4182998, at *8 (Del.Ch. Sept.11, 2008) ("Simply put, the implied covenant requires that the 'discretion-exercising party' make that decision in good faith."); *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1055 (Del.Ch.1984) ("[I]f one party is given discretion in determining whether the condition in fact has occurred that party must use good faith in making that determination."), *aff'd,* 575 A.2d 1131 (Del. 1990); *see, e.g., Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC,* 2009 WL 1124451, at *7–8 (Del.Ch. Apr.20, 2009) (denying motion to dismiss claim under implied covenant where plaintiff adequately alleged that managing entity used discretion to decline to cause entities it controlled to perform tasks in furtherance of agreement); *Chamison v. HealthTrust, Inc.,* 735 A.2d 912, 922 (Del. Ch.1999) (finding indemnitor breached the implied covenant by exercising its "broad discretion" to choose conflicted counsel for indemnitee), *aff'd,* 748 A.2d 407 (Del.2000); *see generally* Paul M. Altman & Srinivas M. Raju, *Delaware Alternative Entities and the Implied Contractual Covenant of Good Faith and Fair Dealing Under Delaware Law,* 60 Bus. Law. 1469, 1480–81 (2005) ("Delaware cases generally support the proposition that the Implied Covenant requires that such discretion must be exercised in good faith and consistent with the reasonable expectations of the parties.").

of the greater consideration that Squid Soap hoped to achieve through the earn-out was the risk that Airborne would fail. Unfortunately for Squid Soap, Airborne did not succeed, but that does not allow Squid Soap to rewrite the deal it cut in more optimistic days. I therefore enter judgment on the pleadings against Squid Soap and in favor of Airborne on Squid Soap's implied covenant claim.

### E. The Claims Against Weil.

 Squid Soap seeks to hold Weil liable under theories of aiding and abetting and conspiracy. These theories require an underlying wrong that Weil could have aided or abetted or conspired to effect. I have already held that there is no underlying wrong. I therefore enter judgment in Weil's favor and do not reach any of Weil's unique arguments.

### F. Airborne And Weil's Affirmative Claims For Relief.

My analysis of Squid Soap's counter-claims largely disposes of all of the issues presented by the motion for judgment on the pleadings. For completeness and because two issues are not suitable for disposition on the present record, I now address briefly the five counts of Airborne and Weil's complaint.

Count I of the complaint sought a declaration that Airborne had not breached the APA and had complied fully with its terms by tendering the assets for return to Squid Soap pursuant to the Asset Return Provisions. As the foregoing discussion demonstrates, I agree with Airborne.

Along similar lines, Count IV of the complaint sought a decree of specific performance "compelling Squid Soap to accept return of the purchased assets." Although I agree with Airborne's interpretation of the Asset Return Provisions, I see no need for a decree of specific performance at this stage of the proceedings and based on the arguments made to date. I will be surprised if the parties continue to litigate Count IV in light of my rulings, but technically it is not resolved by this opinion.

Count II of the complaint sought a declaration that Weil was not liable under the APA. This is a conclusion I have already reached.

Count III of the complaint sought a declaration that the exclusive forum selection provision contained in Section 10.4 of the Agreement was valid and binding. As a remedy, that count sought a decree of specific performance barring Squid Soap from litigating anywhere other than in this Court. Count V sought an injunction to the same effect. In light of the dismissal of the Texas action, Squid Soap's decision to litigate here, and my opinion, I see no need for either form of relief. If Squid Soap were now to attempt to litigate elsewhere, that would present a different set of facts. At present, there is no need for me to act.

The complaint continues to state a claim, however, that Squid Soap breached Section 10.4 of the APA by litigating initially in Texas. Airborne has requested damages as an alternative form of relief. This claim for breach of the APA remains live and is not subject to the entry of judgment on the pleadings.

### III. CONCLUSION

Except for Airborne's request for a decree of specific performance enforcing the Asset Return Provisions and claim for damages based on a breach of Section 10.4 of the APA, plaintiffs' motion for judgment on the pleadings is GRANTED. Plaintiffs will submit a form of order implementing this decision upon five days' notice to the defendants.