# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| L-5 Healthcare Partners, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0412-KSJM |
| | ) | |
| Alphatec Holdings, Inc., | ) | |
| | ) | |
| Defendant, | ) | |
| Counterclaim Plaintiff. | ) | |

## MEMORANDUM OPINION

Date Submitted: July 14, 2020
Date Decided: October 12, 2020

William M. Lafferty, D. McKinley Measley, Thomas P. Will, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, Delaware; Antonio Yanez, Jr., Alexander L. Cheney, WILLKIE FARR & GALLAGHER LLP, New York, New York; *Counsel for L-5 Healthcare Partners, LLC*.

Philip A. Rovner, Jonathan A. Choa, Jaclyn C. Levy, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Counsel for Alphatec Holdings, Inc.*

**McCORMICK, V.C.**

This action arises out of a March 2018 share purchase agreement between Plaintiff L-5 Healthcare Partners, LLC ("L-5") and Defendant Alphatec Holdings, Inc. ("Alphatec"). The purchase agreement requires that whenever Alphatec authorizes the issuance and sale of common stock equivalents to a third-party buyer, Alphatec must first offer L-5 a pro-rata opportunity to participate in that issuance at the same price and on the same terms as the third-party.

In November 2018, Alphatec issued warrants convertible into Alphatec common stock to nonparty Squadron Medical Finance Solutions LLC ("Squadron") pursuant to a credit agreement. In March 2019, Alphatec again agreed to issue (and in June 2019 issued) warrants convertible to Alphatec common stock at a price and on terms that differed from the first transaction. Later, Alphatec made a proposal to L-5 to acquire warrants based on a blended version of the prices and terms in the 2018 agreement and the 2019 agreement. Alphatec's proposal to L-5 was subject to approval by Alphatec's board and further negotiations with Squadron.

L-5 filed this lawsuit to enforce its preemption rights. L-5 first claims that the 2019 agreement and subsequent issuance constituted an authorization that triggered L-5's preemption rights. L-5 next claims that the blended-terms proposal did not satisfy L-5's preemption rights because it did not constitute an offer to sell and because the blended terms were not the same price or the same terms. L-5 also

claims that it is entitled to fee-shifting and indemnification for its fees and costs incurred in this litigation.

L-5 has moved for partial judgment on the pleadings, and this decision grants that motion in part. L-5 is entitled to a declaration that the 2019 agreement with Squadron triggered L-5's preemption rights and that Alphatec's contingent proposal did not constitute an "offer to sell" sufficient to satisfy L-5's preemption rights. Yet, factual issues foreclose judgment on the pleadings on Alphatec's affirmative defenses and on the question of whether Alphatec's blended-terms proposal complied with the price and term requirements of the purchase agreement. The motion is denied as to those issues and as to L-5's claims for fee-shifting and indemnification, which are more appropriately resolved at a later stage of this action.

## I. FACTUAL BACKGROUND

This statement of facts is drawn from the pleadings, and the documents attached to and incorporated by reference in the pleadings.

### A. The Purchase Agreement

L-5 and Alphatec are parties to a Securities Purchase Agreement ("Purchase Agreement")[1] dated March 8, 2018, under which L-5 purchased 25,000 shares of

---

[1] C.A. No. 2019-0412-KSJM Docket ("Dkt.") 1, Verified Compl. ("Compl.") Ex. A ("Purchase Agreement").

Alphatec preferred stock for $25 million.[2]  The Purchase Agreement grants L-5 preemption rights in the event that L-5 achieved an ownership level of at least 12.5% of Alphatec's outstanding stock.[3]  L-5 converted its preferred stock such that, at all times relevant to this parties' dispute, L-5's ownership interest has exceeded the 12.5% threshold.[4]

L-5's preemption rights are set forth in Section 4.18(a) of the Purchase Agreement, which provides that prior to authorizing "the issuance and sale of any Common Stock or Common Stock Equivalents," Alphatec "will first offer to sell to [L-5] a pro rata portion of such securities . . . at the same price and on the same terms" as those offered to another party.[5]  Section 4.18(a) reads in its entirety:

> Immediately following the Closing, and for so long as the LI Group beneficially owns such number of shares of Common Stock on a fully diluted basis (calculated in accordance with Section 4.11(h)) equal to or greater than the Threshold Ownership Percentage, if [Alphatec] authorizes the issuance and sale of any Common Stock or Common Stock Equivalents (other than any Exempt Issuance),[[6]] [Alphatec] will first offer to sell to [L-5], a

---

[2] Compl. ¶ 1, 9.

[3] Purchase Agreement § 4.18(a).

[4] Compl. ¶ 9.

[5] Purchase Agreement § 4.18(a).

[6] "Exempt Issuance" is defined to include the issuance of securities in connection with specified transactions and the filing of a universal shelf registration statement, none of which are at issue here.  *See id.* § 1.1.

pro rata portion of such securities equal to the percentage determined by dividing (i) the number of shares of Common Stock held by the LI Group (determined on a fully-diluted basis (calculated in accordance with Section 4.11(h)), by (ii) the total number of shares of Common Stock then outstanding (determined on a fully-diluted basis (calculated in accordance with Section 4.11(h)). The members of the LI Group (as determined by [L-5]) will be entitled to purchase all or part of such stock or securities at the same price and on the same terms as such stock or securities are to be offered to any other Person.[7]

"Common Stock Equivalents" is defined to include warrants convertible into Alphatec common stock.[8]

Section 4.8 imposes indemnification obligations on Alphatec for all "losses, liabilities, obligations, claims, contingencies, damages, costs and expenses, including . . . reasonable attorneys' fees and costs of investigation that [L-5] may suffer or incur as a result of or relating to . . . any breach of" the Purchase Agreement, including violations of Section 4.18.[9] In the event of a dispute resulting in an action to enforce a provision of the Purchase Agreement by either party, Section 5.9 additionally requires that "the prevailing party in such Action or Proceeding shall be reimbursed by the non-prevailing party for its reasonable attorneys' fees and other

---

[7] *Id.* § 4.18(a).

[8] *Id.* § 1.1.

[9] *Id.* § 4.8.

4

costs and expenses incurred with the investigation, preparation and prosecution of such Action or Proceeding."[10]

## B. The 2018 Agreement

On November 6, 2018, Alphatec executed a Credit, Security and Guaranty Agreement ("2018 Agreement")[11] with Squadron.[12] Under the 2018 Agreement, Squadron provided Alphatec with a $35 million term loan facility,[13] and Alphatec granted Squadron warrants entitling Squadron "to purchase 845,000 shares of common stock of [Alphatec] at $3.15 per share."[14] L-5 did not assert and does not seek to enforce its preemption rights in connection with the 2018 Agreement.[15]

## C. The 2019 Agreement

Several months later, Alphatec sought additional capital and contacted both L-5 and Squadron to determine their interest in a debt financing arrangement.[16] L-5 declined. Squadron agreed. On March 27, 2019, Alphatec and Squadron executed

---

[10] *Id*. § 5.9.

[11] Compl. Ex. B.

[12] Compl. ¶16.

[13] 2018 Agreement § 2.1(a).

[14] *Id*. §§ 2.1(e), 1.1.

[15] Compl. ¶ 17.

[16] Dkt. 11, Def.'s Answer to Verified Compl. and Verified Countercls. ("Answer" or "Countercls.") ¶¶ 16–17, 19.

the First Amendment to Credit, Security and Guaranty Agreement (the "2019 Agreement").[17]

Under the 2019 Agreement, Squadron provided Alphatec an additional term loan of $30 million (the "Additional Term Loan").[18] The 2019 Agreement required that Alphatec grant Squadron warrants to purchase 4,838,710 shares of common stock of Alphatec.[19] This additional grant of warrants would not become due until Alphatec drew from the Additional Term Loan.[20] The 2019 Agreement alters and restates the 2018 Agreement's definition of Warrants to establish a new price of $2.17.[21]

---

[17] Compl. Ex. C.

[18] Compl. ¶¶ 17, 19; *see also* 2019 Agreement ¶ 3(B) (amending § 2.1(a) of the 2018 Agreement).

[19] 2019 Agreement ¶ 3(A) (amending § 1.1 of the 2018 Agreement).

[20] *Id*.

[21] *Id*. (defining "Warrants" as "(i) the warrants granted to [Squadron] (including any designee of [Squadron]) in connection with the Initial Term Loan on the Closing Date to purchase 845,000 shares of common stock of [Alphatec] at $3.15 per share and (ii) the warrants to be granted to [Squadron] (including any designee of [Squadron]) on the date of the initial drawing by [Alphatec] under the Additional Term Loan to purchase 4,838,710 shares of common stock of Holdings at $2.17 per share, such Warrant shall be substantially in the form of Exhibit B").

6

### D.     The Proposal

Alphatec and L-5 had been in communication during Alphatec's negotiations with Squadron regarding the 2019 Agreement.[22]  On March 7, 2019, in response to a letter from L-5's counsel, Alphatec provided L-5 a copy of the binding commitment letter and attached term sheet that Squadron had executed earlier that day.[23]  After some back-and-forth between Alphatec and L-5 as to whether the 2019 Agreement triggered L-5's preemption rights, Alphatec made a proposal pursuant to Section 4.18 on May 17, 2019 (the "Proposal").[24]  The Proposal took the form of a term sheet that purported to reflect the terms of Alphatec's agreement with Squadron.[25]

Noting the ongoing disagreement as to L-5's preemption rights, the Proposal referenced the protections of "Fed. Rule of Evid. 408 and Cal. Evid. Code 1152" and was labeled with the heading: "For Mediation Purposes Only."[26]

The Proposal sought to replicate the price and terms of the 2018 Agreement and the 2019 Agreement together.  To that end, it required that L-5 initially make a

---

[22] Countercls. ¶¶ 33–36.

[23] *Id*. ¶¶ 37–39.

[24] Countercls. Ex. C; *accord* Countercls. ¶ 62.

[25] Proposal; Countercls. ¶ 62.

[26] Proposal at 1.

first term loan of $11,550,137 in exchange for warrants to purchase 256,839 Alphatec common shares at $3.15 per share[27]—the exercise price set forth in the 2018 Agreement.[28] It then required that L-5 commit to make a second term loan of $9,118,529.[29] Upon Alphatec's draw on the second term loan, L-5 would receive warrants to purchase 1,470,731 shares of Alphatec common stock at $2.17 per share[30]—the exercise price set forth in the 2019 Agreement.[31] L-5 calculates the weighted average of the exercise price of L-5's warrants as $2.32, or around 7% more than the $2.17 exercise price available to Squadron in the 2019 Amendment.[32]

The Proposal was contingent. It contemplated that L-5 would provide Alphatec with a credit facility representing a pro rata portion of the loans Alphatec obtained from Squadron.[33] The Proposal additionally provided that it was "subject

---

[27] *Id*. at 1–2.

[28] 2019 Agreement ¶ 3(A).

[29] Proposal at 1.

[30] *Id*. at 2.

[31] 2019 Agreement ¶ 3(A).

[32] L-5 calculates the weighted average by "(i) taking the sum of the exercise price of the warrants multiplied by the number of corresponding shares that could be acquired with those warrants, and (ii) dividing that sum by the total number of shares L-5 could acquire with its warrants. In this instance, the formula is: (($3.15 x 256,839) + ($2.17 x 1,470,731)) / (256,839 + 1,470,731) = *$2.32*." Dkt. 17, Pl.'s-Countercl. Def.'s Mem. of Law in Supp. of Its Mot. for J. on the Pleadings ("Pl.'s Opening Brief") at 8–9 n.2.

[33] Proposal at 1.

to final approval" by Alphatec's Board of Directors.[34]  As Alphatec clarified in a May 23, 2019 letter, execution of the Proposal also depended on Squadron agreeing to retroactively carve out a pro rata portion of the warrants it received under the 2018 and 2019 Agreements.[35]  The letter stated:

> [T]he [Proposal], if accepted by L-5, requires Squadron to carve out a pro rata portion of its pre-existing security position …. [Alphatec] is unwilling to disrupt, potentially significantly, its relationship with its largest lender, without L-5 first making a binding commitment to execute the resulting deal.[36]

Squadron had no obligation to allow a carve-out, and would have been well within its rights under the 2019 Agreement to reject L-5's involvement.[37]

The Proposal made explicit that Alphatec was "under no obligation to draw" from the L-5 loan.[38]  The deal contemplated by the Proposal thus created a scenario

---

[34] *Id*. at 1 n.1.

[35] Countercls. Ex. D, Letter from Craig Hunsaker, General Counsel, Alphatec Spine, Inc., to John Staikos, attorney, LS Power and John Wade, Chief Compliance Officer, LS Power (May 23, 2019) ("May 23, 2019 Letter").

[36] *Id*.

[37] The 2019 Agreement explicitly restricted third-party participation:  "The terms and provisions of this Amendment shall be for the sole benefit of the parties hereto and their respective successors and assigns; no other person, firm, entity or corporation shall have any right, benefit or interest under this Amendment."  2019 Agreement ¶ 13.

[38] Proposal at 1.

where if Alphatec chose to draw from the Squadron loan but not the L-5 loan, Squadron would obtain additional warrants and L-5 would not.[39]

## E. The 2019 Issuance

On June 13, 2019, the Board approved a draw on the Additional Term Loan and issue the corresponding warrants to Squadron (the "2019 Issuance").[40] The Board resolution also approved a warrant issuance to L-5 in the event it accepted the Proposal.[41]

## F. This Litigation

L-5 filed this litigation on June 4, 2019, to enforce its preemption rights. L-5's Complaint asserts three causes of action. In Count I, L-5 seeks a declaration that the 2019 Agreement triggered L-5's preemption rights. In Count II, L-5 seeks a declaration that Alphatec breached the Purchase Agreement by failing to offer L-5 the opportunity to participate in the 2019 Amendment at the same price and on the

---

[39] Section 5.1 of the 2018 Agreement restricted Alphatec's ability to incur additional subsequent debt without Squadron's permission, effectively giving Squadron veto power over Alphatec's ability to draw down on the L-5 loan in the Proposal and on Alphatec's issuance of warrants to L-5 pursuant to that loan. *See* 2018 Agreement, § 5.1 ("No Borrower will . . . create, incur, assume, guarantee or otherwise become or remain directly or indirectly liable with respect to, any Debt, except for Permitted Debt."); *see also id.* § 1.1 (defining "Debt" and "Permitted Debt").

[40] Countercls. ¶¶ 70–71.

[41] *Id.*

terms as Squadron. In Count III, L-5 seeks indemnification under Sections 4.8 and 5.9 of the Purchase Agreement for its reasonable attorneys' fees and other costs and expenses incurred in connection with this action.

On July 30, 2019, Alphatec filed its answer and asserted two counterclaims seeking declarations that mirror the relief sought in Counts I and II of the Complaint.[42] L-5 answered the counterclaims on September 18, 2019.[43]

On January 31, 2020, L-5 moved for partial judgment on the pleadings as to all questions of liability, leaving only the remedy to be determined.[44] The parties completed briefing on the motion on May 6, 2020,[45] and the court held oral argument on July 14, 2020.[46]

## II.   LEGAL ANALYSIS

A motion for judgment on the pleadings under Court of Chancery Rule 12(c) may be granted "where the movant is entitled to judgment as a matter of law and

---

[42] Answer and Countercls.

[43] Dkt. 14, Pl.-Countercl. Def. L-5 Healthcare P'rs. LLC's Ans. and Affirmative Defenses.

[44] Pl.'s Opening Br. at 2.

[45] *See* Dkt. 27, Def.-Countercl. Pl.'s Answering Br. in Opp'n to Pl.-Countercl. Def.'s Mot. for Partial J. on the Pleadings ("Def.'s Ans. Br."); Dkt. 29, Pl.-Countercl. Def.'s Reply Br. in Supp. of Its Mot. for Partial J. on the Pleadings ("Pl.'s Reply Br.").

[46] Dkt. 38, Oral Argument and Partial Rulings of the Ct. Via Zoom on L-5 Healthcare P'rs., LLC's Mot. for Partial J. on the Pleadings and Mot. for Stay of Disc. ("Oral Argument Tr.").

there are no disputed material facts."[47] Judgment on the pleadings "is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact."[48] The court "must draw all reasonable inferences from those facts in the light most favorable to the nonmoving party" and "may consider the agreements attached to the pleadings in making its determination."[49] The court also may take judicial notice of a corporation's public filings.[50]

L-5 moves for judgment on the pleadings as to the following issues: (i) whether the 2019 Amendment triggered L-5's preemption rights; (ii) whether Alphatec breached the Purchase Agreement by failing to offer L-5 the opportunity to participate in the 2019 Amendment "at the same price and on the same terms" as offered to Squadron; and (iii) whether Alphatec is required to indemnify L-5 under Section 4.8 and reimburse L-5 under Section 5.9 of the Purchase Agreement.[51] This decision tackles the issues in that order.

---

[47] *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 1456494, at *4 (Del. Ch. Nov. 5, 2001).

[48] *Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 925 (Del. 2017) (citation omitted); *accord Fortis Advisors LLC v. Meds. Co.*, 2019 WL 7290945, at *1 (Del. Ch. Dec. 18, 2019) (ORDER).

[49] *CorVel Enter. Comp, Inc. v. Schaffer*, 2010 WL 2091212, at *1 (Del. Ch. May 19, 2010).

[50] *Tyson Foods*, 2007 WL 2351071, at *2 (Del. Ch. Aug. 15, 2007).

[51] Pl.'s Opening Brief at 22.

## A. L-5's Preemption Rights Were Triggered.

Under Section 4.18 of the Purchase Agreement, L-5 is entitled to exercise its preemption rights if Alphatec "*authorizes the issuance and sale* of any . . . Common Stock Equivalents" to a third-party.[52] The parties agree that the warrants were Common Stock Equivalents.[53] They dispute whether the issuance and sale of warrants were "authorized" so as to trigger L-5's preemption rights.

L-5's primary argument is that its preemption rights were triggered by the 2019 Issuance. This is a good argument, as the 2019 Issuance was unequivocally an "issuance and sale" that Alphatec "authoriz[ed]." Alphatec does not respond to this argument on its merits. Instead, Alphatec argues that the court should ignore the 2019 Issuance because it occurred after L-5 filed the Verified Complaint. Alphatec, however, admitted the fact of the 2019 Issuance in its Counterclaims.[54] Consistent with the purpose of Rule 12(c),[55] the court can take judicial notice of Alphatec's

---

[52] Purchase Agreement § 4.18(a) (emphasis added).

[53] Answer ¶ 9.

[54] Countercls. ¶¶ 70–71.

[55] *See* 5C *Federal Practice and Procedure* § 1367 (3d ed. 2020) (describing the purpose of the analogous Federal Rule of Civil Procedure as "to provide a means of disposing of cases when the material facts are not in dispute between the parties and a judgment on the merits can be achieved by focusing on the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the district court will take judicial notice").

13

admission for the purpose of this motion.[56] The 2019 Issuance, therefore, triggered L-5's preemption rights under Section 4.18.

For completeness, this decision addresses L-5's alternative argument, which is that 2019 Agreement, standing alone, constituted the requisite "authorization" of the issuance and sale of warrants that triggered L-5's preemption rights. This too is a good argument. "Authorize" means "to formally approve,"[57] or to "give official permission for or approval to."[58] The 2019 Agreement did just that, setting forth the terms and conditions under which the issuance and sale of warrants would occur.

Alphatec responds that under the 2019 Agreement, no warrants were due until Alphatec drew on the Additional Term Loan,[59] and the 2019 Amendment did not

---

[56] *See Merrill v. United Parcel Serv.*, 956 A.2d 1196, 1201–02 (Del. 2008) ("Voluntary and knowing concessions of fact made by a party during judicial proceedings (*e.g.*, statements contained in pleadings . . .) are . . . . traditionally considered conclusive and binding upon both the party against whom they operate, and upon the court."); *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 130 (Del. Ch. 2009) (reiterating permissible sources of facts on a motion for judgment on the pleadings, including defendant's "answer and counterclaims.").

[57] *Authorize*, Black's Law Dictionary (11th ed. 2019).

[58] *PWP Xerion Hldgs. III LLC v. Red Leaf Res., Inc.* 2019 WL 5424778, at *12 (Del. Ch. Oct. 23, 2019) (citations omitted).

[59] Def.'s Ans. Br. at 18; *see* 2019 Agreement ¶ 3(A).

mandate that Alphatec ever draw on the loan.[60]  Alphatec thus argues that the 2019 Agreement alone did not constitute an authorization of the issuance or sale of warrants because an intervening event—Alphatec's decision to draw on the loan— was required.

Alphatec's interpretation does not work.  Many agreements authorize the payment or issuance of consideration upon the completion of a condition, and the presence of a condition in the 2019 Agreement did not render that consideration— the issuance of warrants—somehow less "authorized."  In essence, Alphatec's interpretation confuses the *authorization* of an issuance and sale with the distinct act of satisfying the *conditions* of that issuance and sale.  It further conflates the authorization of the *issuance and sale* of warrants with the distinct act of authorizing a *draw on the Additional Term Loan*.

## B.    The Proposal Was Not an "Offer to Sell."

Having determined that the 2019 Amendment and subsequent issuance triggered L-5's preemption rights, the analysis next turns to the question of whether Alphatec complied with its obligations under Section 4.18 of the Purchase

---

[60] The 2019 Agreement, however, imposes a fine of $300,000 "in the event Borrowers have not completed an initial drawing under the Additional Term Loan on or before June 30, 2019." 2019 Agreement ¶ 3(B).

Agreement to "offer to sell" to L-5 a pro rata portion of the warrants "at the same price and on the same terms."[61]  Alphatec argues that the Proposal contained the "same price" and "same terms" in compliance with this obligation.  In response, L-5 raises a threshold issue, arguing that the Proposal was not in fact an "offer to sell" as required by Section 4.18.

An offer "is a manifestation of assent that empowers another to enter into a contract by manifesting assent in return."[62]  A valid offer "confers upon the offeree the power to create a contract."[63]  The validity of an offer thus requires that "one making an offer assent[] in advance to the proposed bargain, after which all that is required to complete the mutual assent necessary is the assent of the offeree."[64]  A valid offer contains sufficient finality such that an offeree's acceptance of an offer constitutes the last step in forming a contract.[65] Provisions that allow the proponent

[61] Purchase Agreement § 4.18(a).

[62] E. Allan Farnsworth & Zachary Wolfe, 1 *Farnsworth on Contracts* § 3.13 at 3-77 (4th ed. 2019).

[63] *Id*. § 3.03 at 3-7.

[64] 1 *Williston on Contracts* § 4:3 (4th ed. 2020).

[65] *Restatement (Second) of Contracts* § 24 cmt. a (Am. L. Inst. 2020) ("[T]he key concept involves giving the addressee the apparent power to conclude a contract without further action by the other party."); *see also Id.* § 35 cmt. c ("Exercise of the power of acceptance concludes an agreement and a bargain, and thus satisfies one of the requirements for formation…").

of a proposal to unilaterally withdraw it or withhold assent pending approval are typically an indication that a proposal is not an offer.[66]

In light of its contingent nature, L-5 is correct that the Proposal does not constitute an "offer" as required by Section 4.18.  The Proposal was contingent on Board approval.[67]  The Proposal was also contingent on further negotiations with Squadron.  As clarified by the May 23 Letter, if L-5 had accepted the Proposal, Alphatec would *then* "approach Squadron to negotiate L-5's pro rata security interest."[68]  Squadron, through restrictive covenants on Alphatec's ability to take on more debt[69] and the explicit exclusion of third parties to the 2019 Agreement,[70] had

---

[66] *Farnsworth on Contracts* § 3.13 at 3-86 ("[T]he insertion into a proposal of a clause that reserves to its maker the power to close the deal is a compelling indication that the proposal is not an offer. A common example provides that the agreement is not binding until it has been approved at the home office of the maker of the proposal."); *Restatement (Second) of Contracts* § 24 ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited *and will conclude it*." (emphasis added)); *see also Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 156 (Del. Ch. 1985) (finding an offer pursuant to a right of first refusal contingent because it required investor approval and holding that, "[a]lthough Short signed the document it remained unenforceable as to the investors and until such time as the investors approved its terms it was merely an offer to further negotiate."), *superseded by statute on other grounds, as recognized in Wilm. & N. Ry. Co. v. Del. Valley Ry. Co.*, 1999 WL 463705, at *6 (Del. Super. Mar. 30, 1999).

[67] Proposal at 1 n.1.

[68] May 23, 2019 Letter at 1.

[69] 2018 Agreement § 5.1.

[70] 2019 Agreement ¶ 13 ("The terms and provisions of this Amendment shall be for the sole benefit of the parties hereto and their respective successors and assigns; no other

17

functional veto power over L-5's receipt of warrants. Squadron thus had no obligation to revise the 2019 Agreement, to permit L-5's participation, or to allow Alphatec to draw down on an L-5 loan. L-5's acceptance of the Proposal as the offeree would not have been the final step in establishing a contract for these reasons.[71]

Because the Proposal was contingent on approval by both Alphatec's Board and Squadron, it lacked sufficient finality to constitute an offer. The Proposal was thus a promise to further negotiate and not an "offer to sell" as required by Section 4.18 of the Purchase Agreement.[72]

---

person, firm, entity or corporation shall have any right, benefit or interest under this Amendment.").

[71] One way Alphatec could have avoided conditioning the Proposal on further negotiations with Squadron was to first make the "offer to sell" to L-5 before entering into a final agreement with Squadron, as the Purchase Agreement seems to contemplate. Purchase Agreement § 4.18(a) (providing that Alphatec "*first* offer to sell to [L-5] a pro rata portion of such securities . . . at the same price and on the same terms" as those offered to another party (emphasis added)).

[72] L-5 also argues that the Proposal is a settlement offer and not an "offer to sell." Alphatec labeled the Proposal "For Mediation Purposes Only" and "Subject to Fed. Rule of Evid. 408 and Cal. Evid. Code 1152," Proposal at 1, designations that L-5 asks the court to uphold. Generally, Rule 408 prohibits parties for relying on settlement communications to prove or disprove liability. D.R.E. 408; *see also Grunstein v. Silva*, 2011 WL 378782, at *6 (Del. Ch. Jan. 31, 2011) (noting that, under Delaware Rule of Evidence 408, "evidence of an offer in compromise is inadmissible if offered for the purpose of proving or disproving liability"). This decision considers the substance of the Proposal because doing so does not prejudice L-5.

18

Because the Proposal was not an "offer" as required by Section 4.18(a) of the Purchase Agreement, this decision does not reach the question of whether the blended terms of the Proposal complied with Section 4.18(a).[73]

## C.    Reimbursement and Indemnification

Section 5.9 provides that Alphatec must reimburse L-5 for its "reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution" of this litigation if L-5 prevails in this action.[74]  Section 4.8 of the Purchase Agreement further provides that Alphatec must indemnify L-5 for all "losses, liabilities, obligations, claims, contingencies, damages, costs and expenses, including all judgments, amounts paid in settlements, court costs and reasonable attorneys' fees and costs of investigation that [L-5] may suffer or incur as a result of or relating to . . . any breach of . . . [the Purchase Agreement]."[75]

---

[73] It bears noting that this question is not one that lends itself to resolution on the pleadings because evaluating the scope of L-5's preemptive rights raises inherently factual issues. *See HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2020 WL 3620220, at *8 (Del. Ch. July 2, 2020) (denying judgment on the pleading where scope of preemptive rights raised factual issues).  If L-5 defeats Alphatec's affirmative defenses, it seems likely that this issue will be pertinent to the remedy analysis, and development of the factual record will be necessary to determine the relationship of the 2019 Agreement to the 2018 Agreement, among other things.

[74] Purchase Agreement § 5.9.

[75] *Id.* § 4.8.

Claims for reimbursement for legal expenses under a prevailing-party provision are premature in that judicial fee-shifting is awarded "in relation to the results obtained" in the underlying litigation.[76] Claims for indemnification like those at issue here are not ripe for adjudication until the underlying breach has been properly resolved and the breaching party has refused to honor its obligations.[77] L-5's claims for contractual fee-shifting and indemnification are thus premature, unripe.

## D.    Alphatec's Affirmative Defenses

Alphatec argues that its affirmative defenses of acquiescence and estoppel are sufficient to defeat L-5's motion for judgment on the pleadings. Alphatec argues in briefing that L-5 goaded Alphatec into triggering its preemption rights by remaining silent after the 2018 Agreement was executed and that such conduct gives rise to estoppel and acquiescence defenses.[78] L-5 responds that these defenses are conclusory and unsupported by the facts as plead in Alphatec's answer.[79]

---

[76] *Mooney v. Echo Therapeutics, Inc.*, 2015 WL 3413272, at *12 (Del. Ch. May 28, 2015).

[77] *See, e.g.*, *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 194 (Del. 2009) (holding that claims stemming from a "right to indemnification did not ripen until [defendant] was judged to be in breach of the Merger Agreement and [defendant] refused to honor its indemnification obligation").

[78] Def.'s Answering Br. at 27–29.

[79] Pl.'s Reply Br. at 14–16.

Generally speaking, affirmative defenses that amount to "rhythmic incantation[s]" of the menu options of defenses set forth in Court of Chancery Rule 12 will not suffice to defeat a motion for judgment on the pleadings.[80]  A party must plead or otherwise support the basis for those defenses when faced with a Rule 12(c) motion.

In this case, Alphatec has asserted counterclaims, and Alphatec is entitled to inferences that may be drawn from the factual assertions plead in its counterclaims.[81] Accepting those assertions as true, the court finds non-frivolous bases for Alphatec's affirmative defenses which, if proven, could entitle Alphatec to relief from its contractual obligations.  The facts as presented warrant further discovery and preclude judgment on the pleadings in L-5's favor.

---

[80] *GreenStar IH Rep, LLC v. Tutor Perini Corp.*, 2017 WL 5035567, at \*8 & nn.73–74 (Del. Ch. Oct. 31, 2017) (collecting cases).

[81] *See, e.g.*, *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1206 (Del. 1993) (a party moving for judgment on the pleadings "concede[s] all well-pleaded allegations to be true"); *Airborne Health* 984 A.2d at 130 (including counterclaims as pleadings to be considered on a motion for judgment on the pleadings); *see also* Ct. Ch. R. 12(c) ("[A]ny party may move for judgment on the pleadings"); Ct. Ch. R. 13(a) ("A pleading shall state as a counterclaim any claim, which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . ."). Alphatec's counterclaim is part and parcel of its pleading answering L-5's Complaint and asserts facts arising from the same transaction that is the subject matter of L-5's claim.  It is thus a pleading to be considered on this 12(c) motion for judgment on the pleadings.

## III. CONCLUSION

For the foregoing reasons, L-5 is entitled to a declaration that the 2019 Agreement and 2019 Issuance triggered L-5's preemption rights and that the Proposal did not constitute an "offer" compliant with Section 4.18(a) of the Purchase Agreement. This decision does not resolve Alphatec's affirmative defenses, what terms and conditions would be required to match Alphatec's 2019 Agreement with Squadron, or whether L-5 is entitled to its reasonable attorneys' fees and other costs. The motion for partial judgment on the pleadings is GRANTED in part and DENIED in part.