IN THE SUPREME COURT OF THE STATE OF DELAWARE

GLAXO GROUP LIMITED and HUMAN GENOME SCIENCES, INC.,

§
§
§
§
§
§
§
§
§
§
§
§
§
§

No. 25, 2020

Court Below: Superior Court of the State of Delaware

C.A. No. N16C-07-218

Defendants Below, Appellants/Cross-Appellees,

v.

DRIT LP,

Plaintiff Below, Appellee/Cross-Appellant.

Submitted: December 16, 2020
Decided: March 3, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware. **REVERSED**.

Philip A. Rovner, Esquire, and Jonathan A. Choa, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Lisa S. Blatt, Esquire (*argued*), Sarah M. Harris, Esquire, Sumeet P. Dang, Esquire, and Kimberly Broecker, Esquire, WILLIAMS & CONNOLLY LLP, Washington, D.C.; *Attorneys for Defendants-Appellants/Cross-Appellees Glaxo Group Limited and Human Genome Sciences, Inc*.

Gregory P. Williams, Esquire, Chad M. Shandler, Esquire, and Nicole Pedi, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Keith R. Hummel, Esquire (*argued*), and Karin A. DeMasi, Esquire, CRAVATH, SWAINE & MOORE LLP, New York, New York; *Attorneys for Plaintiff-Appellee/Cross-Appellant DRIT LP*.

**SEITZ**, Chief Justice:

Glaxo Group Limited and Human Genome Sciences, Inc. (collectively, "GSK") owned patents covering Benlysta, a lupus treatment drug. To expand its intellectual property rights, GSK filed a patent application with the United States Patent and Trademark Office ("PTO") claiming a method for treating lupus. Biogen Idec MA Inc. ("Biogen") held an issued patent covering a similar method for treating lupus. When parties dispute who was first to discover an invention, the PTO declares an interference. Rather than suffer the delay and uncertainty of an interference proceeding, the parties agreed to settle their differences through a patent license and settlement agreement ("Agreement"). GSK ended up with its issued patent. The PTO cancelled Biogen's patent, and Biogen received upfront and milestone payments and ongoing royalties for Benlysta sales.

The claims in a patent define its metes and bounds. Under the Agreement GSK agreed to make royalty payments to Biogen until the expiration of the last "Valid Claim" of certain patents, including the lupus treatment patent. The Agreement defines a Valid Claim as an unexpired patent claim that has not, among other things, been "disclaimed" by GSK.

GSK paid Biogen royalties on Benlysta sales. After Biogen assigned the Agreement to DRIT LP—an entity that purchases intellectual property royalty streams—GSK filed a statutory disclaimer that disclaimed the patent and all its

claims. GSK notified DRIT that there were no longer any Valid Claims under the Agreement and stopped paying royalties on Benlysta sales.

DRIT sued GSK in the Superior Court for breach of contract and breach of the implied covenant of good faith and fair dealing for failing to pay royalties under the Agreement. The court dismissed DRIT's breach of contract claim but allowed the implied covenant claim to go to a jury trial. The jury found for DRIT, and the court awarded damages.

On appeal, GSK argues that the Superior Court should have granted it judgment as a matter of law on the implied covenant claim. On cross-appeal, DRIT asserts that, if the Court reverses the jury verdict on the implied covenant claim, it should reverse the Superior Court's ruling dismissing the breach of contract claim. For the reasons explained in this opinion, we find that the Superior Court properly dismissed DRIT's breach of contract claim but should have granted GSK judgment as a matter of law on the implied covenant claim. Thus, we reverse the court's judgment.

I.

We recount from the record what are largely undisputed facts relevant to our ruling. In 2007, GSK and Biogen each claimed patent rights to a method for treating lupus. Biogen held an issued U.S. patent and GSK had a pending U.S. patent application covering substantially the same subject matter. At the time of the dispute, U.S. patent law followed a "first to invent" regime where the PTO awarded

3

priority to the party who first came up with the invention.[1] The PTO declared an "interference," which is an administrative proceeding to decide who has priority over the intellectual property rights. For GSK, winning the interference would cancel Biogen's patent. If Biogen prevailed, it could block GSK from commercializing Benlysta. Given the uncertainty, GSK and Biogen agreed to settle their dispute.

First, the parties executed a binding term sheet to navigate their way clear of the interference. The parties appointed a neutral arbitrator to decide the priority between GSK's patent application and Biogen's issued patent. The arbitrator decided that GSK was the first to invent the lupus treatment method. Thus, its patent application had priority over Biogen's issued patent. The parties agreed that GSK would continue with its patent application. Biogen agreed to cancel its patent.

Next, in October 2008, GSK and Biogen entered into the Agreement. GSK agreed to pay Biogen a $3.5 million up-front payment, two milestone payments of $1.5 million each, and royalties on Benlysta sales through the expiration of certain patent rights, including any patent rights from GSK's pending patent application. Section 3.4 of the Agreement states that GSK must pay royalties until expiration of the last "Valid Claim" of any patent covering Benlysta. Section 1.49 of the definitions section defines a "Valid Claim" as:

---

[1] Patent Act of 1952, Pub. L. No. 82-593, 66 Stat. 792 (later amended by the Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) (codified as amended in various sections of 35 U.S.C.)).

[A] claim of an issued, unexpired patent within the Patent Rights that has not expired, lapsed, or been cancelled or abandoned, and that has not been dedicated to the public, disclaimed, or held unenforceable, invalid, or cancelled by a court or administrative agency of competent jurisdiction in an order or decision from which no appeal can be taken or was timely taken, including through opposition, re-examination, reissue or disclaimer.[2]

On December 6, 2011, the PTO issued to GSK U.S. Patent No. 8,071,092 ("'092 Patent"). GSK paid Biogen royalties for Benlysta sales as required by the Agreement. In 2012, DRIT, a healthcare investment vehicle that purchases royalty streams on pharmaceutical products, purchased Biogen's rights under the Agreement. GSK paid royalties to DRIT on Benlysta sales for three years.

What happened next involves patent disclaimers. Some background is helpful. A patent gives its owner the right to exclude others from making, using, offering for sale, or selling an invention.[3] The scope of the monopoly is defined by the claims in the patent. Provided that periodic maintenance fees are paid, a utility patent expires twenty years from the application filing date.[4] Once the patent

---

[2] App. to GSK Opening Br. at A083 (Settlement Agreement § 1.49). The Agreement covers a number of patents. For simplicity, we will refer only to the '092 Patent and Benlysta sales, recognizing that the Agreement is broader.

[3] 35 U.S.C. § 154(a)(1) ("Every patent shall contain . . . a grant to the patentee . . . the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States . . . ."). A patent owner may assign or license his invention at any time during his ownership term. *See* 35 U.S.C. § 261.

[4] 35 U.S.C. § 154(a)(2). In limited circumstances the PTO may extend the patent term to account for undue delays in the patent application examination process. *See* 35 U.S.C. § 154(b).

expires, the patent holder can no longer assert its monopoly over the claimed invention, and typically the invention enters the public domain.[5]

A disclaimer cuts short the patent term. A disclaimer is the "renunciation of one's own legal right or claim, such as a renunciation of a patent claim . . . ."[6] Section 253 of the Patent Act provides that a patentee may voluntarily "disclaim" all or part of his or her interest in a patent.[7] The Patent Act contemplates two types of disclaimers: terminal and statutory disclaimers. Here, GSK filed a statutory disclaimer, which generally is "a statement in which a patent owner relinquishes legal rights to one or more complete claims of a patent."[8]

In 2015, GSK filed a statutory disclaimer and disclaimed the entire term of the '092 Patent from December 6, 2011—the day the PTO granted the patent to

---

[5] *See Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 230 (1964) ("[W]hen the patent expires the monopoly created by it expires, too, and the right to make the [invention] . . . passes to the public."); *see also* Robert A. Matthews, Jr., 1 Annotated Patent Digest § 1:6 (2020) ("When a patent expires, the patentee may no longer assert exclusionary rights . . . .").

[6] DISCLAIMER, Black's Law Dictionary (11th ed. 2019).

[7] 35 U.S.C. § 253(a)-(b); *see also* 37 CFR § 1.321(a). Section 253 provides in relevant part that:

> A patentee, whether of the whole or any sectional interest therein, may, on payment of the fee required by law, make disclaimer of any complete claim, stating therein the extent of his interest in such patent. Such disclaimer shall be in writing, and recorded in the Patent and Trademark Office; and it shall thereafter be considered as part of the original patent to the extent of the interest possessed by the disclaimant and by those claiming under him.

35 U.S.C. § 253(a).

[8] Manual of Patent Examining Procedure § 1490 (2020) (defining statutory disclaimer). A terminal disclaimer "is a statement in which a patentee . . . disclaims or dedicates to the public the entire term or any terminal part of the term of a patent . . . ." *Id.* A terminal disclaimer "disclaims or dedicates to the public the entire term or any terminal part of the term of a patent or patent to be granted." 35 U.S.C. § 253(b) and 37 CFR 1.321(a) and (b).

GSK. GSK informed DRIT that the statutory disclaimer eliminated any "Valid Claim" for royalties under the Agreement. In 2016, DRIT filed an action in the Superior Court and asserted claims for breach of contract and breach of the implied covenant of good faith and fair dealing for what it described as GSK's bad faith disclaimer of the '092 Patent.

GSK moved to dismiss the complaint. For the breach of contract claim, GSK argued that the Agreement expressly authorized GSK to disclaim the patent. For the implied covenant claim, GSK contended that the implied covenant cannot be used to imply terms—like a good faith requirement before disclaiming a patent—that are absent from the Agreement and that Biogen could have sought in negotiations. And, according to GSK, the implied covenant cannot modify action expressly permitted by the Agreement.

DRIT responded with an imaginative interpretation of Section 1.49. As DRIT argued, the phrase "in an order or decision" modified more than its closest antecedent.[9] In addition to modifying "held enforceable, invalid, or cancelled by a court or administrative agency," DRIT claimed that it also modified a patent "*that has not* been dedicated to the public, disclaimed."[10] Thus, any disclaimer must result from "an order or decision" and cannot be disclaimed voluntarily, as was the case

---

[9] App. to GSK Opening Br. at A145 (Memorandum Opinion on Defendants' Motion to Dismiss, *DRIT LP v. Glaxo Group Ltd. and Human Genome Sciences, Inc.*, C.A. No. N16-07-218 WCC NCC, at 13 (Del. Super. Ct. Apr. 6, 2017) [hereinafter *Motion to Dismiss Opinion*]).
[10] *Id.*

here. DRIT also argued that, for the implied covenant claim, the parties did not anticipate that GSK could use a statutory disclaimer to undermine the economic basis for the Agreement. Thus, according to DRIT, the implied covenant required GSK to exercise its right to disclaim in good faith instead of acting in its economic self-interest.

The Superior Court found DRIT's interpretation of Section 1.49 "both legally and grammatically flawed."[11] The court reasoned that GSK had the express contractual right to disclaim the patent, and DRIT's request for the court to "interpret the Agreement as requiring that a Court/agency order or decision precede any disclaimer" violated the closest antecedent rule and was "untenable."[12] The court dismissed the breach of contract claim and held there was "no express contractual restriction" in the Agreement that limited GSK's ability to disclaim its rights to the patent.[13]

But the court allowed DRIT's implied covenant claim to proceed. As the court held, "[w]hen material aspects of an agreement are left to one party's discretion, the implied covenant demands that party exercise its discretion reasonably and in good

---

[11] *Id.* at A146 (*Motion to Dismiss Opinion*, at 14). The Superior Court observed that, "the plain and customary meaning of the term 'disclaim' in the context of patent rights refers to a patentee's renunciation of legal rights to claims of a patent, which is achieved by the patentee's filing of a disclaimer with the [PTO]." *Id.* at A147 (*Motion to Dismiss Opinion*, at 15).

[12] *Id.* at A148 (*Motion to Dismiss Opinion*, at 16).

[13] *Id.* at A149-50 (*Motion to Dismiss Opinion*, at 17-18).

faith."[14] The court also noted that "the royalty payments were a 'critical component of the consideration Biogen accepted in exchange for giving up its claim to ownership of the inventions at issue'" and "it is 'virtually unknown for the owner of a patent voluntarily to disclaim a patent.'"[15] Thus, according to the court, whether GSK acted in bad faith when it disclaimed the '092 Patent was a factual issue to be determined by the jury.

Following discovery, GSK moved for summary judgment on DRIT's implied covenant claim. The Superior Court denied the motion and found that, despite GSK's express contractual right to disclaim the '092 Patent, GSK still had an "overarching obligation to comply with the implied covenant and [to] use good faith when exercising [its] right to disclaim as it impacts [DRIT]'s royalty payments defined in the Agreement."[16] The court concluded that genuine issues of material fact remained "whether [GSK] disclaimed the '092 Patent for the sole reason of eliminating royalty payments and therefore acted in bad faith[,]" or if GSK did so

---

[14] *Id.* at A150 (*Motion to Dismiss Opinion*, at 18 (citing *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146-47 (Del. Ch. 2009); *Black Horse Capital, LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *30 (Del. Ch. Sept. 30, 2014))).

[15] *Id.* at A152 (*Motion to Dismiss Opinion*, at 20 (quoting Pl.'s Answ. Br. in Opp'n to Defs.' Mot. to Dismiss at 14-15; Compl. at ¶ 50)).

[16] Ex. A to GSK Opening Br. at 19 (Memorandum Opinion on Defendants' Motion for Summary Judgment; Defendants' Motion to Dismiss; and Plaintiffs' Motion for Partial Summary Judgment, *DRIT LP v. Glaxo Grp. Ltd. & Human Genome Sciences, Inc.*, C.A. No. N16-07-218 WCC NCC, at 19 (Del. Super. Ct. Aug. 17, 2018)).

for strategic business reasons because the patent was likely invalid and no longer commercially viable.[17]

After trial, the jury returned a verdict that GSK breached the implied covenant by statutorily disclaiming the '092 Patent. GSK renewed its motion for judgment as a matter of law. The Superior Court denied the motion, holding that GSK's disclaimer "was such an unusual event" that "it would not have been reasonably anticipated by the parties."[18] And, even if it had been anticipated, "it certainly would have been addressed in the contract as it went to the "fundamental underpinning of the Agreement, the continued payment of royalties for which Biogen bargained."[19] After rejecting GSK's argument that misleading and prejudicial testimony by DRIT's expert witness warranted a new trial, the court awarded damages to DRIT for lost royalties.

## II.

GSK argues on appeal that the Superior Court erred by allowing DRIT to rely on the implied covenant of good faith and fair dealing to displace express contract terms. GSK contends that the Agreement permitted disclaimer of the '092 Patent. Thus, the Agreement leaves no gap, and the implied covenant cannot be used to alter the Agreement's express terms. GSK further asserts that because neither party

---

[17] *Id.* at 20.
[18] *DRIT LP v. Glaxo Grp. Ltd.*, C.A. No. N16C-07-2018 WCC CCLD, 2019 WL 5420095, at *3 (Del. Super. Ct. Oct. 17, 2019).
[19] *Id.*

disputes that the Patent Act gives GSK the right to disclaim its patent, the parties could have reasonably foreseen the possibility of a disclaimer, given the express use of the term in the Valid Claim definition. GSK also argues that DRIT failed to prove that GSK would have agreed to limit its right to disclaim the '092 Patent while the parties were negotiating the Agreement. Finally, GSK contends that the Superior Court erroneously implied a limitation on GSK's right to disclaim because the Agreement did not require GSK to exercise any discretion before disclaiming the '092 Patent.[20]

In response, DRIT asserts that the Agreement does not expressly authorize GSK to disclaim the '092 Patent. Rather, the term "disclaimer" only appears in the definition of a Valid Claim, and according to DRIT, definitions do not confer any affirmative rights. DRIT further contends that the parties failed to foresee GSK's use of a disclaimer as it did here. Thus, the Superior Court correctly held that the implied covenant required GSK to exercise its discretion to disclaim reasonably and in good faith. According to DRIT, the evidence presented at trial was sufficient to support the jury's verdict that GSK acted in bad faith and breached the implied covenant. On cross-appeal, DRIT argues that if the Court finds that the implied

---

[20] GSK makes two additional arguments on appeal: (1) that GSK is entitled to a new trial because the Superior Court admitted misleading and irrelevant testimony from DRIT's expert witness, and (2) that court erred in basing its damages calculation on the date that the patent was issued. Because we find that the Superior Court erred in applying the implied covenant, we need not reach GSK's second and third arguments on appeal.

covenant does not apply, we should uphold the Superior Court's judgment on the alternative ground rejected by the Superior Court—that GSK breached the Agreement by failing to pay royalties even after GSK disclaimed the '092 Patent.

We review questions of contract law and contract interpretation *de novo*.[21] Likewise, we review *de novo* the denial of a motion for judgment as a matter of law.[22]

A.

We address first whether the Superior Court erred when it dismissed DRIT's breach of contract claim. Section 3.4 of the Agreement states that GSK must pay royalties until expiration of the last "Valid Claim" of any patent within the scope of the Agreement. Under Section 1.49, a "Valid Claim" of a patent is one "that has not expired, lapsed, or been cancelled or abandoned, and that has not been dedicated to the public, disclaimed . . . ."[23] GSK disclaimed the '092 Patent and its claims. After disclaimer, GSK no longer had a "Valid Claim." Thus, its royalty obligation ceased under the Agreement.

DRIT argues that "the Agreement unambiguously provides that GSK must continue to make royalty payments if it *voluntarily* disclaims the royalty-bearing patent."[24] As DRIT argues, a voluntary disclaimer "is not an event which would

---

[21] *Salamone v. Gorman*, 106 A.3d 354, 367 (Del. 2014).
[22] *Trievel v. Sabo*, 714 A.2d 742, 744 (Del. 1998).
[23] App. to GSK Opening Br. at A083 (Settlement Agreement § 1.49).
[24] DRIT Answering Br. on Appeal and Opening Br. on Cross-Appeal at 53 (emphasis added).

take a royalty-bearing patent out of the corpus of valid claims."[25]  But DRIT resorts to the same tortured reading of Section 1.49 that was rejected by the Superior Court—that the phrase "ordered by a court or administrative agency" modifies disclaimers and other voluntary acts such that only disclaimers ordered by a court or administrative agency terminate the royalty payment obligation.

We agree with the Superior Court that DRIT's interpretation of Section 1.49 is "both legally and grammatically flawed."[26]  Under the Agreement, a "Valid Claim" is one "that has not been . . . disclaimed . . . or held unenforceable, invalid, or cancelled by a court or administrative agency."[27]  DRIT reads the word "or" out of the agreement.[28]  It also ignores the fact that declaring patent claims "unenforceable, invalid, or cancelled" are actions taken by courts and administrative agencies, while a disclaimer is an action taken by the patent holder.  And DRIT disregards the last antecedent rule, where "by a court or administrative agency" logically refers to its closest antecedent—"held unenforceable, invalid, or cancelled."[29]  The Superior Court correctly held that, under the express terms of the

---

[25] *Id.* at 54.
[26] App. to GSK Opening Br. at A146 (*Motion to Dismiss Opinion*, at 14).
[27] *Id.* at A083 (Settlement Agreement § 1.49).
[28] *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010)) (Delaware courts "read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage").
[29] *Rubick v. Sec. Instrument Corp.*, 766 A.2d 15, 18 (Del. 2000) ("The [last antecedent] rule . . . is that '[r]eferential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent.'") (alteration in original) (citation omitted).

Agreement, "once Defendants disclaimed the patent rights covering Benlysta, they were no longer required under the Settlement Agreement to pay royalties with respect to U.S. sales of the product."[30]

B.

Next, we turn to DRIT's implied covenant claim. Under Delaware law, sophisticated parties are bound by the terms of their agreement. Even if the bargain they strike ends up a bad deal for one or both parties, the court's role is to enforce the agreement as written.[31] As we have explained, "[p]arties have a right to enter into good and bad contracts, the law enforces both."[32] Holding sophisticated contracting parties to their agreement promotes certainty and predictability in commercial transactions.[33]

There are, however, instances when parties fail to foresee events not covered by their agreement or defer decisions to later. "No contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency."[34]

---

[30] App. to GSK Opening Br. at A150 (*Motion to Dismiss Opinion*, at 18).

[31] 11 Williston on Contracts § 31.5 (4th ed. 2020) ("Unless the contract is voidable due to mistake, fraud, unconscionability, or another invalidating cause, or invalid in whole or in part due to illegality or another violation of public policy, the court must enforce it as drafted by the parties, according to the terms employed, and may not make a new contract for the parties or rewrite their contract while purporting to interpret or construe it.").

[32] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

[33] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) (courts should not use the implied covenant to grant substantive rights a party did not extract during negotiation because "[b]y such judicial action, the reliability of written contracts is undermined, thus diminishing the wealth-creating potential of voluntary agreements").

[34] *Amirsaleh v. Board of Trade of City of New York, Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008).

14

Subject to the express terms of the agreement, when gaps in an agreement lead to controversy, the court has in its toolbox the implied covenant of good faith and fair dealing to fill in the spaces between the written words. The implied covenant, inherent in all agreements, ensures that the parties deal honestly and fairly with each other when addressing gaps in their agreement.[35] The court's goal is to preserve the economic expectations of the parties.[36]

The implied covenant, however, is a "cautious enterprise."[37] As we have reinforced on many occasions, it is "a limited and extraordinary legal remedy"[38] and "not an equitable remedy for rebalancing economic interests that could have been anticipated."[39] It cannot be invoked "when the contract addresses the conduct at issue."[40]

The implied covenant should not have been deployed in this case. There was no gap to fill in the Agreement. As the Superior Court found, and we affirm on

---

[35] *Dieckman v. Regency GP LP*, 155 A.3d 358, 361, 367 (Del. 2017) (explaining that "[t]he implied covenant is inherent in all contracts[,]" and that the covenant is well-suited to imply obvious contractual terms–"like the requirement that [a party] not engage in misleading or deceptive conduct to obtain [certain] approvals").

[36] *Nemec*, 991 A.2d at 1126 (the implied covenant is invoked to "imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected").

[37] *Cincinnati SMSA LP v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998).

[38] *Nemec*, 991 A.2d at 1128.

[39] *Id*; *see also Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 445 (Del. 2005) ("[A]bsent grounds for reformation, courts should not rewrite contracts.").

[40] *Oxbow Carbon & Materials Hldgs., Inc. v. Crestview-Oxbow Acquisition LLC*, 202 A.3d 482, 507 (Del. 2019) (citing *Nationwide Emerging Managers, LLC v. Northpointe Hldgs., LLC*, 112 A.3d 878, 896-97 (Del. 2015)).

appeal, the parties agreed that GSK could voluntarily disclaim patents. GSK filed a statutory disclaimer of the '092 Patent. The parties excluded "disclaimed" patents from royalty payments. "[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement."[41]

Further, that GSK might act voluntarily to end its patent rights was not an event outside the contemplation of the parties. Disclaimer was just one of several ways for GSK to voluntarily end its patent rights. GSK could let the patent "lapse" for failing to pay periodic maintenance fees.[42] GSK could also "abandon" the patent by "permitting the invention to be subject to open competition."[43] And, as happened here, GSK disclaimed the '092 Patent. Biogen knew that court rulings or administrative proceedings were not the only way GSK's patent rights could be terminated. The time to demand restrictions on an express contractual right was during negotiations—not years later through the implied covenant.[44]

Finally, we disagree with the Superior Court's characterization of GSK's right to disclaim patents as a discretionary act that GSK had to exercise in good faith. It is one thing to imply a good faith obligation when the parties have expressly agreed

---

[41] *Dunlap*, 878 A.2d at 441.
[42] *See* 35 U.S.C. § 41(b)(1).
[43] 2 Moy's Walker on Patents § 8:266 (4th ed.) (citing 35 U.S.C. §102(c) (pre-America Invents Act)).
[44] *Nemec*, 911 A.2d at 1126 ("The implied covenant only applies to developments that could not be anticipated, not developments that the parties simply failed to consider . . . .").

that a certain act is within a party's discretion.[45] It is another matter to imply discretion to restrict actions expressly permitted by the parties' agreement. The implied covenant imposes a good faith and fair dealing obligation when a contract confers discretion on a party.[46] It should not be used to imply terms that modify or negate an unrestricted contractual right authorized by an agreement.

GSK and Biogen agreed that GSK's royalty obligations would end if GSK disclaimed the '092 Patent. Biogen no doubt assumed that GSK had strong economic incentives to maintain its patent rights. After all, a patent confers monopoly power on the patent holder to eliminate competition and maximize profits. Unfortunately for DRIT, the economic incentives shifted under the Agreement. It

---

[45] *See Oxbow*, 202 A.3d at 503-04 (observing that a shareholder agreement conferring discretion to the board was a *contractual* choice that does not relieve the board of its obligation to exercise that discretion in good faith) (emphasis added); *Airborne*, 984 A.2d at 146-47 & n.1 ("When a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith."); *see also Gilbert v. El Paso Co.*, 420 A.2d 1050, 1055 (Del. Ch. 1984) ("[I]f one party is given discretion in determining whether the condition in fact has occurred that party must use good faith in making that determination."), *aff'd*, 575 A.2d 1131 (Del. 1990).

[46] *See Miller v. HCP Trumpet Inv., LLC*, 194 A.3d 908, 2018 WL 4600818, at *1 (Del. Sept. 20, 2018) (TABLE) (observing that "the mere vesting of 'sole discretion'" to the board as an express contractual term "[does] not relieve the Board of its obligation to use that discretion consistently with the implied covenant . . ."); *Charlotte Broad., LLC v. Davis Broad. of Atlanta, L.L.C.*, 2015 WL 3863245, at *7 (Del. Super. Ct. June 10, 2015) (concluding that where a contract permitted either party "in its sole discretion" to terminate the agreement, the implied covenant required plaintiffs to exercise that discretion in good faith); *Amirsaleh*, 2008 WL 4182998, at *8 (holding that a party to a merger agreement was required to exercise its discretion in good faith where the agreement mandated that election forms be submitted at a time and on a date that the contracting parties "mutually agree"); *see also Chamison v. HealthTrust, Inc.*, 735 A.2d 912, 922 (Del. Ch. 1999) (finding that the defendant-indemnitor breached the implied covenant by exercising its "broad discretion" in an attempt to force the plaintiff-indemnitee to accept a defense that was inferior to a known alternative), *aff'd* 748 A.2d 407 (Del. 2000); *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *7 (Del. Ch. Apr. 20, 2009) (applying the implied covenant where an operating agreement gave the defendant "broad authority" to manage and operate an LLC, but the defendant did so in bad faith).

appears that GSK no longer needed the patent to protect Benlysta from competition. As assignee, DRIT is stuck with the agreement that Biogen negotiated. DRIT cannot use the implied covenant to vary the express terms of the Agreement, which gave GSK an unqualified right to disclaim the '092 Patent and end its royalty obligation.

## III.

The Superior Court's judgment is reversed.