**COURT OF CHANCERY
OF THE
STATE OF DELAWARE**

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: May 8, 2023
Date Decided: August 29, 2023

David E. Ross, Esquire
Eric D. Selden, Esquire
A. Gage Whirley, Esquire
ROSS ARONSTAM & MORITZ LLP
Hercules Building
1313 N. Market Street, Suite 1001
Wilmington, Delaware 19801

Norman M. Powell, Esquire
Emily V. Burton, Esquire
Lauren Dunkle Fortunato, Esquire
Nehama L. Hanoch, Esquire
YOUNG CONAWAY SARGATT &
TAYLOR, LLP
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801

Stephen Norma, Esquire
Ellis H. Huff, Esquire
POTTER ANDERSON & CORROON LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, Delaware 19801

Re: *Paul Capital Advisors, L.L.C., et al. v. Holland, et al.*, C.A. No.
2022-0167-SG

Dear Counsel:

Alexander's cutting of the Gordian Knot with a single stroke is a metaphor for resolving complex litigation that has been worn smooth by overuse, yet it comes temptingly to mind as I labor to pick oakum from the tangle of contracts and undertakings by which, here, the Plaintiffs attempted to monetize certain illiquid assets; my job is made more difficult by the fact that it is unexplained, and not

intuitive, why the parties felt the complexity of the methods employed had merit. This Letter Opinion is my second opinion concerning that task. The Defendants offer me a blade to slice this monkey's fist of contract issues, via their Motions to Dismiss, addressed below; upon review, however, I must decline.

I will not repeat the statement of the facts set out, in painstaking if still abbreviated form, in *Paul Capital I*;[1] I adopt that statement of facts here, and address only briefly the facts necessary to my denial, via this Letter Opinion, of the bulk of the Defendants' Motions to Dismiss the remaining allegations of the Second Amended Complaint (the "SAC"). The liquidation scheme which the parties here employed involved the use of trusts (the "Exchange Trusts"), to hold the assets to be monetized, and the resulting sales' proceeds. In *Paul Capital I*, I found that the Plaintiffs were not fiduciary beneficiaries of those Exchange Trusts. They therefore lacked standing to remove the Trust Advisors to the Exchange Trusts or maintain breach of fiduciary duty claims.[2] That left the contract claims alleged in the SAC (together with tort claims alleging fraud and promissory estoppel). This Letter Opinion addresses the various Defendants' Motions to Dismiss those claims as well under Rule 12(b)(6).

---

[1] *Paul Cap. Advisors, L.L.C., et al. v. Stahl, et al.*, 2022 WL 3418769, at *4–7 (Del. Ch. Aug. 17, 2022) *as corrected* (Aug. 25, 2022) ("*Paul Capital I*").
[2] *Id.* at *12.

The following adumbration of the facts is sufficient, I think, to convey the complexity of the allegations in the SAC: The Plaintiffs are a Delaware LLC involved in private equity, and associated partnerships that function as private equity funds (jointly, "Paul Capital"). Paul Capital holds—or held—investments in other private equity funds. These investments are termed "Secondaries." They are generally illiquid. By 2017, Paul Capital intended to sell these Secondaries for cash.

Paul Capital found a buyer in Defendant Beneficent Company Group ("BEN"), a Delaware limited partnership. BEN, however, was cash-poor; it proposed to buy the Paul Capital Secondaries with another illiquid asset, BEN common units. To advance Paul Capital's goal of receiving cash, and presumably for other reasons the parties have not adequately revealed, BEN and Paul Capital concocted a scheme that is laid out below in simplified form.

The parties agreed that the transactions would be undertaken through a Delaware LLC, MHT, which is run by Defendant Murray Holland (together with MHT, the "MHT Defendants"). Paul Capital transferred the secondary assets to MHT. MHT formed nine trusts, the Exchange Trusts referred to above, and transferred the Secondaries to these trusts. The Exchange Trusts were controlled by two Trust Advisors, one of whom was Mr. Holland. The Exchange Trusts in turn transferred the Secondaries, or rights therein, to the buyer, BEN. In return, BEN transferred the BEN units to the Exchange Trusts. The parties contemplated an

3

auction of the BEN units for cash. MHT was to receive the proceeds, then pay up to $550 million to Paul Capital, and retaining for itself any amount exceeding this sum. If, on the other hand, the auction came in under $500 million, BEN was obligated to pay the difference to Paul Capital, in cash or additional BEN common units (the Contingent Value Rights (the "CVRs")). Thus, the parties contemplated that, post auction, Paul Capital would have at least $500 million and at most $550 million in cash or a combination of cash and CVRs, BEN would have the Secondaries, and MHT would have an amount contingent on the auction achieving in excess of $550 million in cash. But that is not what happened.

Instead, the auction resulted in a winning bid, from GWG Holdings, Inc. ("GWGH"), another company associated with Defendant Holland. But this was not an all-cash bid. It was composed of $150 million in cash, and GWGH common stock together with GWGH "L-Bonds." The stock and bonds were supposedly worth $400 million, making the GWGH bid worth $550 million. Neither the common stock nor the bonds were liquid assets, however, and thus could not satisfy Paul Capital's purpose, to receive cash for the Secondaries.

To address this purpose, MHT and the Exchange Trusts undertook to facilitate the refinancing of the L-Bonds and sale of the GWGH common stock promptly. On those terms, and despite the fact that it was exchanging illiquid Paul Capital assets for illiquid BEN assets, and in turn exchanging those for illiquid GWGH assets, Paul

4

Capital accepted GWGH's offer as the winner of the auction. The Exchange Trusts transferred the BEN units to GWGH and received $150 million in cash and the illiquid GWGH assets in 2018. MHT and the Trusts paid the $150 million cash to Paul Capital, and retained the GWGH assets, which again, they had undertaken to convert to cash promptly. This did not happen. GWGH has since gone bankrupt.

This complex scheme, presented in simplified form above, was memorialized by numerous agreements among the parties. Paul Capital, which asserts that it is a party or third-party beneficiary to the pertinent contracts, points out that it has transferred its secondary assets, which it valued at $500 million, to BEN for a return of only $150 million in cash. It seeks damages for breach of the contracts against the various entities involved and the advisors of the Exchange Trusts. It also asserts claims of promissory estoppel and fraud. I address these causes of action, below.

### Counts III, IV, VI and VII—The Contract Claims

These counts address the breach of contract actions that the Plaintiffs have brought under the complex contractual scheme described above. In the SAC, the Plaintiffs describe the contracts at issue, that they were breached, and that they were parties or third-party beneficiaries of each. They allege resulting damages. This states a prima facie case under the notice pleading standard.[3] The Defendants counter with defenses individual to each contract, arguing that the contracts did not

---

[3] Ct. Ch. R. 8(a).

include Plaintiffs as intended beneficiaries or otherwise excluded them from seeking damages. It is true that contractual issues often present fertile ground for motions on the pleadings because unambiguous contract issues may be resolved as a matter of law from the face of the agreements.[4] Here, by contrast, I am unable to determine to what extent all the contracts are to be read together, and without an understanding of the motivation of the particular contractual scheme as it was known to the parties at the time of contracting, I am unwilling to determine rights under the various agreements at the pleadings stage.[5] While discovery may make these issues ripe for summary judgment, I decline to dismiss the contract counts.

Finally, the Defendants point out that, with respect to the Trust Agreements, I have already found that they excluded the Plaintiffs as trust beneficiaries.[6] They argue that it follows that the Plaintiffs cannot be third-party beneficiaries of the Trust Agreements.[7] But this is a non-sequitur. Whether a party is a third-party contractual beneficiary is dependent on the intent of the parties thereto,[8] and that intent is not necessarily foreclosed by a renunciation of *fiduciary* duties to the third parties.

---

[4] *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).
[5] *See Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017) (explaining that an understanding of the business relationship among the parties informs analysis of the contractual scheme).
[6] *Paul Capital I*, 2022 WL 3418769, at *11.
[7] Opening Br. Defs. Supp. Mot. Dismiss 34–35, Dkt. No. 173 ("BEN OB"); Reply Br. Defs. Supp. Mot. Dismiss 2–7, Dkt. No. 187 ("BEN RB").
[8] *Madison Realty P'rs 7, LLC v. Ag ISA, LLC*, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001).

**Count VI and VIII—The Tort Claims**

*Promissory Estoppel*

To state a claim for promissory estoppel, a plaintiff must allege that (i) the defendant made a promise to the plaintiff; (ii) the defendant reasonably expected the plaintiff to take, or refrain from taking, action; (iii) the plaintiff acted to his detriment due to his reasonable reliance on the promise; and (iv) the plaintiff would suffer an injustice unless the promise is enforced.[9]  The promise "must be a real promise, not just mere expressions of expectation, opinion, or assumption."[10]  It must also be a "manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made; a person's assurance that the person will or will not do something."[11]

With respect to the MHT Defendants, Plaintiffs allege that, by emailing the GWGH Winning Bid Notice to Plaintiffs, the MHT Defendants "promised" Plaintiffs that (1) "GWGH would make an up-front cash payment of $150 million;" (2) "GWGH 'is *obligated* to seek to refinance its debt with a more favorable credit facility and/or institutional note within 12 months following issuance[;]'" (3) "'[a] nationally recognized bank, such as Credit Suisse, *will be engaged* to sell the stock in an orderly manner through one or a series of transactions in 2018, delivering cash

---

[9] *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000).
[10] *Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760, 805 (Del. Ch. 2007).
[11] *Promise*, BLACK'S LAW DICTIONARY (11th ed. 2019).

proceeds for the sellers[;]'" and (4) "'[c]losing is expected to be ***on or prior to*** April 30, 2018[.]'"[12]

Similarly, BEN is alleged to have made the following "promises" by sending Plaintiffs a "Due Diligence Package": (1) "that GWGH had 'obligations' to refinance the GWGH L-Bonds within 12 months of the closing of the Auction of the BEN [ ] Units, and that 'GWG[H]'s financial models reflect the refinancing occurring no later than October 2018';" (2) "that the Trust Advisors of the . . . Exchange Trusts were similarly '***obligated*** to reduce the L-Bonds to cash and distribute cash proceeds ***as quickly as practicable***[;]'" (3) "that GWGH and the Trust Advisors, for the benefit of the . . . Exchange Trusts, would agree to negotiate in good faith the terms of an Orderly Marketing Agreement with a major investment bank for the orderly marketing and resale of the GWGH common stock; and" (4) "the GWGH 'shares ***will be sold*** following the expiration of that [six-month] lock-up per the terms of an orderly marketing agreement[.]'"[13]

Plaintiffs further allege that the MHT Defendants and BEN both forwarded a comfort letter from GWGH (the "GWGH Comfort Letter")[14] and later forwarded an undertakings letter from GWGH (the "GWGH Undertakings Letter" and, together

---

[12] Verified Second Am. Compl. ¶ 336, Dkt. No. 66 (emphases in original) ("SAC").
[13] *Id.* ¶¶ 341, 343 (emphases in original).
[14] *Id.* ¶ 347.

with the GWGH Comfort Letter, the "GWGH Letters"),[15] both of which contained "promises" that Plaintiffs admit were made by GWGH.[16] By delivering the GWGH Winning Bid Notice, the Due Diligence Package, GWGH's Comfort Letter, and GWGH's Undertakings Letter, the Defendants allegedly intended to induce Plaintiffs to accept the bid made by GWGH.[17] Relying on these alleged promises from the Defendants, Plaintiffs accepted GWGH's bid even though it did not consist entirely of cash,[18] as Plaintiffs had intended when entering into this complex contractual scheme. As a result of accepting GWGH's bid, Plaintiffs allegedly "suffered and will continue to suffer substantial damages[,]" an "injustice [that] can only be avoided by enforcing [Defendants'] promises to Plaintiffs."[19]

The Defendants counter Plaintiffs' allegations by arguing the alleged promises that Plaintiffs attribute to Defendants were made instead by non-party GWGH.[20] Even if the mere act of delivering the documents, which contain GWGH's promises, to Plaintiffs was sufficient to allege that the promises contained within are also attributable to the Defendants, the Defendants argue that Plaintiffs did not adequately plead reasonable reliance because Plaintiffs were able to, and allegedly

---

[15] *Id.* ¶ 351.
[16] *Id.* ¶¶ 348, 352.
[17] *Id.* ¶¶ 334, 341, 347, 351.
[18] *Id.* ¶¶ 335, 342, 345, 350, 353.
[19] *Id.* ¶ 354.
[20] BEN OB 42–44; BEN RB 23–24; Opening Br. Defs. MHT and Holland Supp. Mot. Dismiss 22–29, Dkt. No. 174 ("MHT Defs.' OB"); Reply Br. Defs. MHT and Holland Supp. Mot. Dismiss 20–23, Dkt. No. 185 ("MHT Defs.' RB").

did, conduct their own due diligence of GWGH and the promises it made.[21]  Lastly, the Defendants assert Plaintiffs have suffered no injustice because Plaintiffs have received, and continue to be entitled to receive, the consideration Plaintiffs agreed to receive by accepting GWGH's bid.[22]

Drawing all reasonable inferences in favor of Plaintiffs, as I must do at the pleadings stage,[23] I conclude that Plaintiffs have sufficiently alleged that the Due Diligence Package contained promises—that the assets would be sold in a definite time, for instance—attributable to BEN and meant to encourage Plaintiffs to accept the GWGH bid, which Plaintiffs did to their detriment.

Plaintiffs, however, have failed to sufficiently allege that the MHT Defendants made any promises to Plaintiffs.  The alleged promises contained in the GWGH Winning Bid Notice are either attributable directly to GWGH, rather than the MHT Defendants, or are mere recitations of the material terms of GWGH's bid. Communicating the material terms of GWGH's bid to Plaintiffs is insufficient to support a claim that the MHT Defendants promised anything to Plaintiffs. Therefore, Plaintiffs have failed to state a claim for promissory estoppel against the MHT Defendants with respect to the GWGH Winning Bid Notice.

---

[21] BEN OB 44–45; BEN RB 24–25; MHT Defs.' OB 29–30; MHT Defs.' RB 23–25.
[22] BEN RB 44; MHT Defs.' OB 30; MHT Defs.' RB 25.
[23] *Orman v. Cullman*, 794 A.2d 5, 15 (Del. Ch. 2002).

With respect to the GWGH Letters, both of which were allegedly forwarded to Plaintiffs by BEN and the MHT Defendants, Plaintiffs failed to allege that the promises contained therein were made by either BEN or the MHT Defendants. In the SAC, Plaintiffs repeatedly acknowledge that the promises in the GWGH Letters were *made by GWGH*.[24] In an attempt to enforce GWGH's promises against BEN and the MHT Defendants, Plaintiffs consistently state that the GWGH Letters were forwarded to Plaintiffs by MHT and BEN to induce Plaintiffs into accepting GWGH's bid.[25] Plaintiffs have failed to allege how merely forwarding the GWGH Letters, without more, could constitute a "manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made[,]"[26] on behalf of BEN and the MHT Defendants. Therefore, Plaintiffs' promissory estoppel claim with respect to the GWGH Letters fails to state a cause of action and must be dismissed.

*The Fraud Claims*

<u>Common Law Fraud</u>

"To establish a claim for [common law] fraud, a plaintiff must prove (i) a false representation, (ii) a defendant's knowledge or belief of its falsity or his reckless

---

[24] *See, e.g.,* SAC ¶¶ 350, 353 ("Plaintiffs would not have accepted GWGH's bid in the absence of the ***promises and representations that GWGH made*** in the [GWGH Letters] that w[ere] forwarded by MHT and BEN.") (emphasis added).

[25] *See* SAC ¶¶ 347, 350–51, 353.

[26] *Promise*, BLACK'S LAW DICTIONARY (11th ed. 2019).

indifferent to its truth, (iii) a defendant's intention to induce action, (iv) reasonable reliance, and (v) causally related damages."[27]

Plaintiffs allege that the Defendants "attempted to extinguish [Plaintiffs' CVR Contract] rights by knowingly and falsely inducing [Plaintiffs'] representative on BEN's board to sign the Second Amendment to the CVR Contract."[28] To accomplish this feat, a BEN lawyer, on behalf of BEN, convinced Plaintiffs' designated BEN board member, David de Weese, to sign the Second Amendment to the CVR Contract (the "Second Amendment") by claiming the signature "was simply a ministerial act" because Plaintiffs had already "approved the terms of the amendment."[29] Plaintiffs allege, however, that the Second Amendment was designed "to substantially alter and effectively extinguish [Plaintiffs'] rights under the . . . CVR Contract[]"[30] by changing the contractual "definition of 'Net Auction Consideration'" to eliminate BEN's obligation to ensure Plaintiffs "receive[d] $500 million in *cash*[.]"[31]

The BEN defendants assert that Plaintiffs' fraud claim necessarily fails to state a claim because the BEN lawyer did not make a misrepresentation to Plaintiffs

---

[27] *In re Wayport, Inc. Litig.*, 76 A.3d 296, 323 (Del. Ch. 2013).
[28] SAC ¶ 376.
[29] *Id.* ¶ 380.
[30] *Id.* ¶ 385.
[31] *Id.* ¶¶ 386–87 (emphasis in original).

12

because (1) the statements were not misrepresentations and (2) the statements were not made *to Plaintiffs*.[32] I consider each assertion in turn.

While BEN claims the statements the BEN lawyer made to de Weese were all accurate,[33] Plaintiffs contend that the BEN lawyer misrepresented (1) the legal effect of the Second Amendment; (2) that Plaintiffs had already approved the Second Amendment; and (3) that de Weese's signature was merely a "ministerial act."[34] At this stage, I must accept the Plaintiffs' allegations as true. The BEN defendants further assert that these statements, even if false, were not made *to Plaintiffs* because de Weese was acting solely in his capacity as director on BEN's board when he signed the Second Amendment.[35] Viewing the facts in the light most favorable to Plaintiffs, I find that Plaintiffs have sufficiently alleged that, while BEN's LLC Agreement eliminated de Weese's fiduciary duties owed to BEN, de Weese still owed such duties to Plaintiffs.[36] I can reasonably infer that in signing the Second Amendment, de Weese acted on behalf of his principal, the Plaintiffs, and that the allegedly false statements induced him to do so.

The MHT Defendants aptly point out that the allegedly false statements upon which Plaintiffs rest their fraud claim were made only by a *BEN* lawyer.[37] Plaintiffs

---

[32] BEN OB 50–51, 55–57.
[33] BEN RB 27–29.
[34] SAC ¶¶ 380–84.
[35] BEN OB 50–51; BEN RB 25–27.
[36] *See* Pls.' Answering Br. 73–75; SAC ¶ 211.
[37] MHT Defs.' RB 25; *see* SAC ¶¶ 375–92.

13

have failed to allege that the MHT Defendants made any false misrepresentations to Plaintiffs. Therefore, Plaintiffs' fraud claim with respect to the MHT Defendants fails on its face to state a claim and must be dismissed.

Equitable Fraud

"A claim for equitable fraud can lie only where the claimant sufficiently pleads the existence of: (1) a special relationship between the parties or other special equities, such as some form of fiduciary relationship; or (2) a justification for a remedy that only equity can afford."[38]

Plaintiffs fail to allege that a special relationship exists between them and BEN or the MHT Defendants. As contractual counterparties, absent unusual circumstances, Plaintiffs do not share a special relationship with either BEN or the MHT Defendants for the purposes of equitable fraud.[39]

**Conclusion**

With respect to the Contract Claims, Counts III, IV, V, and VII, Defendants' Motions to Dismiss are DENIED. BEN's Motion to Dismiss Count VI concerning the GWGH Letters and BEN's Motion to Dismiss Count VIII with respect to the equitable fraud claim are GRANTED. BEN's Motion to Dismiss Count VI with

---

[38] *Zebroski v. Progressive Direct Ins. Co.*, 2014 WL 2156984, at *7 (Del. Ch. Apr. 30, 2014) (citation omitted).
[39] *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 144 (Del. Ch. 2009) (explaining that there exists no special circumstances meriting application of the doctrine of equitable fraud where the parties "[a]re counterparties who negotiated at arms' length.").

respect to the Due Diligence Package and Count VIII with respect to the common law fraud claim are DENIED.  The MHT Defendants' Motion to Dismiss Counts VI and VIII are GRANTED.  The parties should submit an appropriate form of order.

Sincerely,

*/s/ Sam Glasscock III*
Vice Chancellor